1  PHILIP GREEN (CalBN 92389)
   BEVERLY R. GREEN (CalBN 92388)
2  LAW OFFICES OF GREEN & GREEN
   1000 4th Street, Suite 595
3  San Rafael, CA  94901
   (415) 457-8300
4  phil@iplegal.com

5  Attorneys for Plaintiff/Counterclaim-Defendant Alphaville Design, Inc.
   and Counterclaim-Defendants David Lee and Peggy Lee
6
7  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
     A Limited Liability Partnership
     Including Professional Corporations
8  NEIL A. SMITH, Cal. Bar No. 63777
   P. CRAIG CARDON, Cal. Bar No. 168646
9  Four Embarcadero Center, 17th Floor
   San Francisco, California  94111-4109
10 Telephone:    415-434-9100
   Facsimile:    415-434-3947
11 nsmith@sheppardmullin.com
   ccardon@sheppardmullin.com
12
   Attorneys for Plaintiff/Counterclaim-Defendant
13 Alphaville Design, Inc.

14                UNITED STATES DISTRICT COURT

15      NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

16

17

18 | ALPHAVILLE DESIGN, INC., a Delaware corporation, | Case No. 07-CV-05569 MHP |

| | **[REDACTED VERSION]** |
| Plaintiff, | |
| v. | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ALPHAVILLE DESIGN, INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION** |
| KNOLL, INC., a Delaware corporation, | |
| Defendant. | |
| AND RELATED COUNTERCLAIMS. | Date:        December 15, 2008 |
| | Time:        2:00 pm |
| | Courtroom:   18 |
| | Judge:       Hon. Marilyn H. Patel |

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................1

II.   STATEMENT OF FACT ........................................................................2

    A.    The Parties. ..................................................................................2

    B.    Mies van der Rohe and His Designs. ...........................................3

        1.    Patents Of Mies' Designs. ..................................................3

        2.    The Agreement Between Mies And Knoll............................3

        3.    The Functionality Of Mies' Designs. .................................4

    C.    Third Party Use of the Designs. ...................................................6

    D.    Knoll's Registrations. ..................................................................8

    E.    Knoll Knew of Alphaville Five Years Ago But Took No Action. .........................9

III.  ARGUMENT........................................................................................10

    A.    Knoll's Counterclaims Against Alphaville are Barred Under the Doctrine
        of Laches. ...................................................................................11

        1.    Knoll Delayed In Asserting Its Claims Against Alphaville.......................12

        2.    Knoll's Delay Was Unreasonable. ...................................13

        3.    Alphaville Has Suffered And Will Continue To Suffer Substantial
            Prejudice Caused By Knoll's Delay. .................................16

    B.    The Designs Have Not Acquired Secondary Meaning and are Not Subject
        to Trademark Protection. ............................................................18

    C.    Alphaville has Not Infringed and is Not Infringing BARCELONA. ...................19

    D.    Knoll's Design Registrations are Invalid Because They Were Acquired By
        Fraud On The United States Patent & Trademark Office.......................20

        1.    Knoll's Representation That It Had Exclusive Right To Use The
            Designs Was Knowingly False. .........................................21

        2.    Knoll's Representation That the Designs Were Not Subject to
            Patent Protection or Applications Also Was Untrue.................................23

IV.   CONCLUSION.....................................................................................25

## TABLE OF AUTHORITIES

<u>Federal Cases</u>

*Americana Trading Inc. v. Russ Berrie & Co.*,
   966 F.2d 1284 (9th Cir. 1992) ................................................................18

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).............................................................................10

*Bart Schwartz International Textile, Ltd. v. Federal Trade Commission*,
   289 F.2d 665 (CCPA 1961) ...................................................................20

*Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*,
   871 F.2d 690 (6th Cir. 1989) .................................................................18

*Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*,
   293 F. Supp. 892 (S.D.N.Y. 1968) .........................................................13

*Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*,
   *aff'd and modified*, 433 F.2d 686, 703-04 (2d Cir. 1970) .....................13

*Carter-Wallace, Inc. v. Proctor & Gamble Co.*,
   434 F.2d 794 (9th Cir. 1970) .................................................................18

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986).............................................................................10

*Danjaq LLC v. Sony Corp.*,
   263 F.3d 942 (9th Cir. 2001) .................................................................17

*Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.*,
   841 F. Supp. 1339 (E.D.N.Y. 1994) ......................................................21

*EFS Marketing v. Russ Berrie & Co.*,
   76 F.3d 487 (2d Cir. 1996)....................................................................18

*E-Systems, Inc v. Monitek, Inc.*,
   720 F.2d 604 (9th Cir. 1983) .................................................................13

*GoTo.com, Inc. v. Walt Disney Co.*,
   202 F.3d 1199 (9th Cir. 2000) ...............................................................14

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*,
   304 F.3d 829 (9th Cir. 2002) .................................................11, 12, 13

*Maids to Order Inc. v. Maid-to-Order Inc.*,
   78 U.S.P.Q. 2d 1899 (TTAB 2006) ........................................................21

*Marshal Fields & Co. v. Mrs. Fields Cookies*,
   11 U.S.P.Q. 2d 1355 (TTAB 1989) ..................................................21, 22

*Matrix Motor Co., Inc. v. Toyota Jidosha Kabushiki Kaisha*,
   290 F. Supp. 2d 1083 (C.D. Ca. 2003) ..................................................14

*Medinol Ltd. Neuro Vasx Inc.,*
   67 U.S.P.Q. 2d 1205 (TTAB 2003) .................................................................11, 20, 21

*Miller v. Glenn Miller Productions, Inc.,*
   454 F.3d 975 (9th Cir. 2006) ...............................................................................12, 13

*Morehouse Manufacturing Corp. v. J. Strickland & Co.,*
   407 F.2d 881 (CCPA 1969) .........................................................................................21

*NAACP v. NAACP Legal Defense & Education Fund, Inc.,*
   753 F.2d 131 (D.C. Cir. 1985) ....................................................................................16

*PostX Corp. v. docSpace Co., Inc.,*
   80 F. Supp. 2d 1056 (N.D. Ca. 1999) ........................................................................14

*Qualitex Co. v. Jacobson Products Co.,*
   314 U.S. 159 (1995).............................................................................................23, 24

*Rachel v. Banana Republic, Inc.,*
   831 F.2d 1503 (9th Cir. 1987) ....................................................................................24

*Robi v. Five Platters, Inc.,*
   918 F.2d 1439 (9th Cir. 1990) ....................................................................................21

*Secular Organizations for Sobriety, Inc. v. Ullrich,*
   213 F.3d 1125 (9th Cir. 2000) ....................................................................................18

*Tillamook Country Smoker, Inc. v. Tillamook County Creamery Association,*
   465 F.2d 1102 (9th Cir. 2006) ....................................................................................11

*Torres v. Cantine Torresella S.r.l.,*
   808 F.2d 56 (Fed. Cir. 1986)........................................................................................21

*Traffix Devices, Inc. v. Marketing Displays, Inc.,*
   532 U.S. 23 (2001)........................................................................................................23

*Vuitton et Fils S.A. v. J. Young Enterprises, Inc.,*
   644 F.2d 769 (9th Cir. 1981) ......................................................................................24

*Wal-Mart Stores, Inc.,*
   539 U.S. at 214-15 ......................................................................................................20

*Wal-Mart Stores, Inc. v. Samara Brothers, Inc.,*
   529 U.S. 205 (2000)........................................................................................18, 20, 22, 23

*Western Worldwide Enterprises Group Inc. v. Qinqdao Brewery,*
   17 U.S.P.Q. 2d 1137 (TTAB 1990) ............................................................................21

State Cases

*Saul Zaentz Co. v. Wozniak Travel, Inc., No. C 06-5421 MHP,*
   2008 WL. 2949423 (N.D. Ca. 2008) ..............................................11, 12, 13, 16, 17

Federal Statutes

Federal Rule of Civil Procedure
    § 56(c) ..............................................................................................................10
    § 56(e) ..............................................................................................................11

15 U.S.C. § 1114 ..........................................................................................................11

15 U.S.C. § 1115 ..........................................................................................................11

State Statutes

Business and Professions Code
    § 14247 .............................................................................................................11
    § 17200 et seq ...................................................................................................11

Other Authorities

Trademark Manual of Examining Procedure ("TMEP") at § 1202.02(a)......................................25

1        Plaintiff and counter-defendant Alphaville Design, Inc. and counter-defendants David

2   Lee and Peggy Lee (collectively "Alphaville") hereby submit their memorandum of points and

3   authorities in support of their Motion for Summary Judgment or, in the Alternative, Summary

4   Adjudication in this action.

5   **I.   INTRODUCTION**

6        Though Knoll would have this Court believe otherwise, this is not a case about the

7   trademark for the word BARCELONA.  It is about the technical designs of furniture by the

8   iconic architect Mies van der Rohe ("Mies").  Knoll has attempted to confuse the U.S. Patent &

9   Trademark Office ("PTO"), consumers and this Court between its purported rights in the word

10  BARCELONA and its rights to use Mies' name, on the one hand, and its nonexistent rights in

11  functional furniture designs.  Alphaville does not seek to deprive Knoll of any rights to use Mies'

12  name, any purported rights it might have in the mark BARCELONA, the right to use the Mies

13  name in connection with his furniture designs, or even to hold itself out as the only manufacturer

14  authorized by Mies.  However, Alphaville does seek to prevent Knoll from shoehorning the

15  functional furniture designs into any rights in the word mark or Mies' name into a capricious

16  assertion of exclusive rights over functional furniture designs, particularly after its executives

17  have acknowledged that no such rights exist and when Knoll has permitted numerous

18  manufacturers to produce reproductions of these designs without license or permission from

19  Knoll for longer than most customers of Knoll or Alphaville have been alive.

20       Knoll delayed in asserting its purported claims against Alphaville and its claims in this

21  case should be barred by the doctrine of laches.  Alphaville is not infringing on Knoll's purported

22  rights in the BARCELONA mark, which are weak at best and Knoll has no rights in the

23  functional and often-copied designs at issue in this case, registrations of which Knoll obtained by

24  misleading the PTO.  Accordingly, summary judgment should be entered in favor of Alphaville.

25  **II.   STATEMENT OF FACT**

26  **A.   The Parties.**

27       Alphaville is a small corporation founded in April 2003 and based in Fremont, California.

28  Declaration of David Lee ("Lee Decl."), submitted concurrently herewith, at ¶ 3.  Alphaville sells

1   the early to mid-20[th] century Bauhaus-style furniture at issue in this case.  Alphaville has sold the

2   furniture at issue since its founding.  *Id.* at ¶ 8.  Alphaville began selling the furniture at issue

3   based on its observation of the plethora of such furniture on the market for many decades and

4   produced by numerous manufacturers other than Knoll, including Palazzetti Express, Inc.

5   ("Palazzetti"), Gordon International ("Gordon") and Design Within Reach ("DWR").  *Id.* at ¶¶ 7,

6   12-14, 30, 31 & 34.  Although Alphaville used the Barcelona name in connection with certain of

7   its furniture when it initially began production, it became aware in 2004 of Knoll's registration of

8   BARCELONA and immediately ceased all trademark use of BARCELONA.  *Id.* at ¶¶ 23-24.

9   Since that time, Alphaville has tried to refer to its furniture items at issue in this case as

10  "reproductions" and has so informed its customers, who are retail furniture stores.  *Id.*

11          Knoll is an international furniture manufacturer with profits of at least one billion dollars

12  over a nine year period.  Lee Decl. at ¶ 5 and Exhibit 7 thereto.  Knoll sells Bauhaus-style

13  furniture based on the designs provided it by Ludwig Mies van der Rohe.  Knoll alleges that it

14  owns trademark registrations for BARCELONA (Trademark Registration No. 772,313) and for

15  designs of what it refers to as the "Barcelona Chair," the "Barcelona Stool," the "Barcelona

16  Couch," the "Brno Chair" and the "Barcelona Table," the names by which the public knows

17  them.  Knoll acquired Trademark Registration Nos. 2,893,025, 2,894,977, 2,894,980, 2,894,798

18  and 2,894,979, respectively for such designs (collectively the "Designs" or the "Barcelona

19  Collection").[1]  *See* Knoll, Inc.'s Answer and Counterclaims filed in this action.

20  **B.      Mies van der Rohe and His Designs.**

21          Mies van der Rohe ("Mies") was a member of the early 20th Century school of

22  architecture known as "Bauhaus."  Ludwig Glaser, *Ludwig Mies van der Rohe – Furniture and*

23  *Furniture Drawings from the Design Collection and the Mies van der Rohe Archives,* The

24  Museum of Modern Art New York, 1977 (the "MOMA Book"), pertinent pages attached as

25  Exhibit 22 to the Declaration of Philip Green ("Green Decl.", submitted herewith, at

26  ───────────────────────

[1]   Alphaville refers herein to the Designs at issue as the Barcelona Chair, Barcelona Stool,
27  Barcelona Couch, Brno Chair and Barcelona Table for simplicity only and does not admit or
    concede that Knoll's registrations of the Designs include the term "Barcelona."

28

1   Alphaville00021 & 216. [The Bauhaus style was intended "to make a statement about functional

2   objectivity . . . as well as the progressive rejection of nooks and crannies and dust-collecting

3   upholstery of furniture of the past." *Id.*

4          1.       Patents Of Mies' Designs.

**REDACTED**

1.

14

18         2.       The Agreement Between Mies And Knoll.

**REDACTED**

22

23

24

25

2

2

2

Knoll only of rights in Mies' name:

> The following year [1965] Mies entered into a contract with Knoll which covered only the right to use his name, as none of his designs were any longer protected. He therefore did not receive royalties but only flat-fee payments over a ten-year period, which proved advantageous for Knoll, since it obviously he must have underestimated the rising demand. . . .

MOMA Book at Alphaville000218.  *See also Mies van der Rohe: Architecture and Design in Stuttgart, Barcelona and Brno* published by the Vitra Design Museum (the "Vitra Book"), pertinent pages attached as Exhibit 10 to Green Decl., at Alphaville000367.

      3.    <u>The Functionality Of Mies' Designs</u>.

The Designs are functional or, at the very least, have functional elements.

**REDACTED**

Both the MOMA and Vitra Books also describe the functionality of the Barcelona Chair. The slight curve of the legs of the Barcelona Chair provides springing properties and the flat steel "bears the load in the direction of the springing movements[.]"  "The right and left side

1  elements [of the Barcelona chair] are connected by cross-members, using bolts similar to the

2  corner overlap joint in traditional timber construction.  The connection was later moved away

3  from the corners where the seat straps concealed the bolts. . . . The volume of the intersection of

4  the side elements was also reduced, thus requiring far less sanding and polishing of the weld."

5  Vitra Book at Alphaville000384 & 403.  "The smooth horizontal surfaces allow the chair to glide

6  over the floor, providing the kind of mobility so dear to the modern man."  MOMA Book at

7  Alphaville000211.

8          Functional elements also exist in the other Designs at issue. The acknowledged impetus

9  for the design of the Brno Chair was that the semicircular armrests of prior cantilevered chairs

10 prohibited the chairs from being placed sufficiently close to tables.  "The Brno chair solved this

11 by having an almost linear front."  The Barcelona (or Tugendhat) Table has a "characteristic

12 cross" that "dominates the base. . . .[T]he flat steel of the Tugendhat table base is placed on edge,

13 thus providing maximum strength."  The Barcelona Couch consisted of "the simplest kind of

14 resting furniture – the horizontal surface.  Users are able to change position whenever they

15 please, following one of the fundamental ideals of modern architecture:  spatial concepts that

16 allow users maximum freedom, completely adaptable to requirements."  Vitra Book at

17 Alphaville000339, 403 & 415.

18 **C.     Third Party Use of the Designs.**

19                          REDACTED

20 (                                                                    For example, "[t]he

21 Dutch mattress manufacturer Auping of Deventer produced a copy and three 'slightly' modified

22 armrest versions in the 1930s. . . .  Gratz Industries, New York, produced the entire Barcelona

23 range, as well as the Brno chair.  Colonial Iron Craftsmen, also from New York, manufactured

24 the Barcelona chair from 1964 under the name 'Avanti', along with its sibling stool and table."

25 Vitra Book at Alphaville000345 & 355   REDACTED

26     In fact,                                                    ' between 1968 and 2004, Knoll and

27 its predecessors were aware of and took no action to stop the sale of such furniture by numerous

28 sellers.  Green Decl. at ¶¶ 10 & 12-16.  As early as 1968, Knoll's predecessors sought to stop

1   third parties from using the word BARCELONA as a trademark and referring to their furniture

2   as "original," but <u>made no effort to stop use of the Designs</u>.   Green Decl. at ¶¶ 10 & 12-16 and

3   Exhibits 3-6 thereto.

4   correspondence to Sm

5   advertisement showin

**REDACTED**

MPA IN SUPPORT OF ALPHAVILLE'S MOTION FOR
SUMMARY JUDGMENT/SUMMARY ADJUDICATION

1

2          . Thereafter, the Knoll Group wrote to Sears

3   suggesting that the Brno Chair be used in Sears' corporate cafeteria and stating "I would like to

4   make clear in writing what makes the Knoll Brno Chair superior to the unauthorized copies on

5   the market. . . . No Brno copy on the market is manufactured to these specifications.  No Brno

6   copy can stand up to the rigorous testing B.I.F.M.A. puts all contract furniture through."  June

7   28, 1991 letter from Jennifer Hakemian "(Hakemian Letter"), attached as Exhibit 28 to Green

8   Decl., at pp. 1-2.

9          Knoll began asserting rights in the Designs only after it obtained trademark registrations

10  of the Designs in 2004.  Green Decl. at ¶¶ 10-17 & Exhibits 3-7 thereto.  Nonetheless,

11  manufacturers other than Knoll continue today to produce the furniture at issue.  Lee Decl. at

12  ¶¶ 25, 32 & 33 & Exhibit 2 thereto.  Further, lawsuits were initiated in November and December

13  2004 between Knoll and Casprini Gruppe Industriale S.p.a. ("Casprini"), Palazzetti and Gordon

14  (collectively the "Palazzetti Defendants").  Smith Decl. at ¶ 16.  Each cases arose, as here, out of

15  alleged trade dress rights in the Designs.  Despite these lawsuits and Knoll's dismissal of them,

16  the Palazzetti Defendants continue to offer for sale the furniture at issue.  Green Decl. at ¶ 17 &

17  Exhibit 16 thereto.

18  **D.      Knoll's Registrations.**

19         The trademark BARCELONA was registered in the name of Drexel Enterprises, Inc. on

20  June 30, 1964 for use with living room, bedroom, and dining room furniture, and occasional

21  tables and chairs.  In 1968, the mark apparently was assigned to Knoll through its predecessors.

22  Record of the PTO TARR database for Registration No. 772,313 for BARCELONA, attached as

23  Exhibit 25 to the Green Decl.

24         In 2003, Knoll filed applications for registration of the Designs.  Exhibits 19-23 to Green

25  Decl.  In support of each of those applications, Knoll submitted declarations of Carl Magnusson,

26  then Vice President and Director of Design at Knoll, and Terence Riley, then the Chief Curator

27  of Architecture and Design at the Museum.  *See, e.g.,* Declaration of Carl G. Magnusson in

28  support of MISCELLANEOUS DESIGN (Barcelona Stool) (the "Magnusson Decl.") and

1   Declaration of Terence Riley in support of MISCELLANEOUS DESIGN (Barcelona Chair) (the

2   "Riley Decl") attached as Exhibits 9 & 13, respectively to Green Decl.; Green Decl. at ¶¶ 19, 20

3   & 24.

4          Mr. Riley's declarations in support of each of the Design applications are virtually

5   identical.  Green Decl. at ¶ 24.  Mr. Riley states in each declaration that the statements made

6   therein are based on, among other things, his review of the files and historical records of the

7   Museum.  Riley Decl. at ¶ 1.  Mr. Riley refers to and attaches as an exhibit to each of his

8   declarations excerpts from the MOMA Book.  *Id.* at ¶ 6 and Exhibit B thereto; Green Decl. at

9   ¶ 17.  Not included in the excerpts or the applications submitted to the PTO are portions of the

10  MOMA Book that contain references to patents obtained by Mies or that state Mies granted only

11  rights to his name to Knoll.  Green Decl. at ¶¶ 24-25 and Exhibits 14 &18 thereto; MOMA Book

12  at Knoll0024224.

13         In each of the his declarations, Mr. Magnusson specifically stated that the Design at issue

14  was not subject to any patent protection or application.  Magnusson Decl. at ¶ 16.  Mr.

15  Magnusson attached as an exhibit to his declarations in support of the applications for

16  registration of the Barcelona Stool, Barcelona Table, Barcelona Couch and Brno Chair an

17  excerpt from the Vitra Book.  Magnusson Decl. at ¶ 13 and Exhibit F thereto; Green Decl. at

18  ¶¶ 10 & 21.  However, portions of the Vitra Book which are not attached to the Mr. Magnusson's

19  declarations actually include references to and photographs of the German and Spanish Patents.

20  Vitra Book at Alphaville000340; Green Decl. at ¶¶ 21-22 and Exhibit 10 thereto.

21         On behalf of Knoll, Mr. Magnusson executed the oaths as part of the applications for

22  registration of the Designs.  Declaration and Power of Attorney ("POA") attached as part of

23  Exhibits 19-23 to Green Decl., at Knoll0026035  As part of each application, Mr. Magnusson

24  declared that:  (1) Knoll believed it was the owner of the Design; (2) to the best of his knowledge

25  or belief no other firm, corporation or associate had the right to use the Design in commerce

26  either in identical form or in such near resemblance thereto as might be likely to cause confusion

27  or mistake; (3) these statements were either known by him to be true or believed to be true; and

28  (4) he knew any willful false statement could jeopardize the validity of the application or any

1  resulting registration. *Id.*

2      At the time he executed the Declarations and the POAs, Mr. Magnusson had a library of

3  publications on Mies and his designs, and was familiar with those publications.  October 30,

4  2008 Deposition of C. Magnusson ("Magnusson Depo."), pertinent pages attached as Exhibit

5  NAS-9 to the Smith Decl., at 39:15–17, 41:4–15.  Among the publications in his library and with

6  which he was familiar were the Vitra Book and the MOMA Book.[2]  *Id.* at 42:12–17.

7  **E.**    **Knoll Knew of Alphaville Five Years Ago But Took No Action.**

8      On August 19, 2003, someone employed by or working for Knoll printed from the

9  Internet pages from Alphaville's then "Internet store" ("Yahoo Store Webpages"), Exhibit __ to

10  the Green Decl.; Green Decl. at ¶ 26 & Exhibit 15 thereto.  The Yahoo Store Webpages included

11  a statement that "inside, you will find . . . Barcelona chairs by Mies van der Rohe" and offered

12  for sale items referred to as "Barcelona Chair & Ottoman Set," "Barcelona Chair" and

13  "Barcelona Day Bed by Mies." *Id.* at Knoll0032448.  The name "Alphaville Design" in the title

14  of the webpage was circled and the  phrase "#2 on yahoo" was written at the top of the

15  document. *Id.*

16      Four years later, on August 17, 2007, Knoll finally sent Alphaville a letter demanding

17  that Alphaville cease selling certain of its Bauhaus-style furniture and threatened litigation for

18  trademark infringement against Alphaville based on Knoll's alleged rights in the Designs.  Lee

19  Decl. at ¶ 15 and Exhibit 1 thereto.  On September 7, 2007, Knoll initiated a lawsuit in the

20  Southern District of New York (the "New York Action") against Danrick Commerce Group,

21  LLC aka ModernCollections.com ("Danrick") based  upon Danrick's sale of the allegedly

22  infringing Alphaville furniture.  Knoll named Alphaville in the New York Action only later, on

23  November 7, 2007.  The New York Action was dismissed by Knoll. *Id.* at ¶ 16.  On November

24  1, 2007, Alphaville filed the current action seeking a declaratory judgment that Knoll's

25  registrations are invalid and that Alphaville has not infringed the Designs.  Lee Decl. at ¶ 16.

26  _____

27  [2]  In this case, Knoll produced, among other documents,

**REDACTED**

28

-10-

## III.   ARGUMENT

Summary judgment is appropriate when the submissions of the parties show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Federal Rule of Civil Procedure ("FRCP") 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Facts that may affect the outcome of the case are material. *Anderson*, 477 U.S. at 248. In reviewing a motion for summary judgment, the burden is on the moving party and the facts must be viewed in the light most favorable to the non-movant. *Anderson*, 477 U.S. at 247; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

On an issue for which the party opposing the motion bears the burden at trial, the moving party need only show there is an absence of evidence supporting the non-movant's case. *Celotex Corp.*, 477 U.S. at 323. Once the moving party has met this burden, the nonmoving party must set forth facts that show a genuine issue of material fact exists. FRCP 56(e).

Although the fact-dependent nature of trademark cases often precludes disposition of a case on summary judgment, summary judgment is appropriate in trademark cases when no dispute exists as to genuine issues of material fact. *Saul Zaentz Co. v. Wozniak Travel, Inc.*, No. C 06-5421 MHP, 2008 WL 2949423, at *8 (N.D. Ca. 2008) (citing *Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n*, 465 F.2d 1102 (9th Cir. 2006)). Summary judgment may properly be granted in trademark cases on both the basis of laches and the absence of valid rights in the marks at issue, including due to fraud on the U.S. Patent & Trademark Office ("PTO"). *Id.*; *Medinol Ltd. Neuro Vasx Inc.*, 67 U.S.P.Q.2d 1205, 1210 (TTAB 2003).

In this case, Knoll's counterclaims are barred under the doctrine of laches, Alphaville is not infringing on any rights Knoll alleges to have in the BARCELONA mark and Knoll does not and cannot have trade dress rights in the designs at issue as a matter of law because the widespread use of those designs negates any secondary meaning necessary for the design to function as trademarks and because Knoll committed fraud on the PTO in obtaining its registrations..

## A.   Knoll's Counterclaims Against Alphaville are Barred Under the Doctrine of Laches.

Knoll's counterclaims against Alphaville are barred under the doctrine of laches. "Laches

1  is an equitable time limitation on a party's right to bring suit, . . . resting on the maxim that 'one

2  who seeks the help of a court of equity must not sleep on his rights.'" *Jarrow Formulas, Inc. v.*

3  *Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002). In this case, Knoll asserts counterclaims

4  of trademark infringement and false designation of origin under the Lanham Act, 15 U.S.C.

5  §§ 1114 and 1125, dilution under California Business & Professions Code ("B&P Code")

6  § 14247, unfair competition under B&P Code § 17200 *et seq.* and unfair competition under

7  California common law. *See* Knoll, Inc.'s Answer and Counterclaims. Laches is a valid defense

8  to Lanham Act claims and state claims of unfair competition and dilution. *Saul Zaentz Co.*, 2008

9  WL 2949423, at *9. Further, "laches is a bar to both monetary and injunctive relief," both of

10  which are sought here by Knoll. *Id.*; Knoll. Inc.'s Answer and Counterclaims.

11        To prevail on a laches defense, Alphaville must show that:  (1) Knoll's delay in filing suit

12  to assert its alleged rights was unreasonable; and (2) Alphaville will suffer prejudice due to the

13  delay if the suit were to continue.[3] *Saul Zaentz Co.* 2008 WL 2949423, at *9 (citing *Jarrow*

14  *Formulas, Inc.*, 304 F.3d at 838). Here, Knoll sat on its alleged rights and unreasonably delayed

15  in filing suit against Alphaville and Alphaville has suffered and will continue to suffer prejudice

16  as a result. In fact, Knoll has permitted others to use what it characterized as "public domain"

17  designs for 40 years, upon which Alphaville relied.

18        1.   Knoll Delayed In Asserting Its Claims Against Alphaville.

19        Knoll delayed in asserting its alleged rights against Alphaville. In April 2003, Alphaville

20  began selling the furniture items complained of in this case. As early as August 2003, Knoll

21  learned of this and did nothing. *See* Yahoo Store Webpages at Knoll032448. In fact, the Yahoo

22  Store Webpages produced by Knoll in this action are dated August 19, 2003 and have

23  handwritten notations that include a circle drawn around the term "Alphaville Design". *Id.*

24  Accordingly, someone in the employ of Knoll printed the webpage and was aware of

25

26  [3]  Although Alphaville is the plaintiff in this action, it initiated this declaratory relief action in response to an action initiated against it by Knoll in the Southern District of New York. Further,

27  Knoll has asserted counterclaims against Alphaville in this case and is in the position of plaintiff for the purpose of a laches analysis.

28

1  Alphaville's sale of the furniture at least on August 19, 2003.

2       A laches defense may be based on either actual or constructive knowledge. *Miller v.*

3  *Glenn Miller Productions, Inc.*, 454 F.3d 975, 980-81 (9th Cir. 2006). "The constructive

4  knowledge standard imposes on a trademark owner the duty to police its rights against potential

5  infringers. *Saul Zaentz Co.* 2008 WL 2949423, at *9. Under the constructive knowledge

6  standard, a trademark owner is deemed to have information it might have obtained had it made a

7  diligent inquiry. *Id.* Here, it is undisputed that Knoll had in its possession a webpage printed on

8  August 19, 2003 showing Alphaville's use of the Designs. Accordingly, Knoll had actual

9  knowledge of Alphaville's alleged infringement at least as early as that date.

10      2.    Knoll's Delay Was Unreasonable.

11      The reasonableness of a party's delay in filing is considered in view of the applicable

12  statute of limitations. *Saul Zaentz Co.* 2008 WL 2949423, at *14. If suit is filed within the

13  applicable limitations period, there is a presumption that laches does not bar the claim. If,

14  however, any part of the alleged wrongful conduct occurs outside the limitations period, there is

15  a presumption that the claims are barred by laches. *Id.* In addition, the Ninth Circuit has set

16  forth additional factors that must be considered in determining the reasonableness of a party's

17  delay including: (i) the strength of the mark at issue; (ii) the plaintiff's diligence in enforcing its

18  rights in the mark; (iii) harm to the senior user if relief is denied; (iv) good faith ignorance of the

19  junior user; (v) competition between the senior and junior users; and (vi) the extent of harm to

20  the junior user due to the delay. *Id.* at *9 & *14 (citing *E-Systems, Inc v. Monitek, Inc.*, 720 F.2d

21  604, 607 (9th Cir. 1983)). "[D]enial of relief on the basis of laches . . . is determined by

22  'consideration of the circumstances of each particular case and a balancing of the interests and

23  equities of the parties.'" *Id.* at *9 (quoting *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 293 F.

24  Supp. 892, 917 (S.D.N.Y. 1968), *aff'd and modified*, 433 F.2d 686, 703-04 (2d Cir. 1970)).

25      When a federal statute such as the Lanham Act does not contain an express statute of

26  limitations, the limitations period is borrowed from the most analogous state law claim. *Id.* at

27  *14 (citing *Jarrow Formulas, Inc.*, 304 F.3d at 836). A four-year limitations period applies to

28  claims of trademark infringement and dilution under California state law – the state claims most

MPA IN SUPPORT OF ALPHAVILLE'S MOTION FOR
SUMMARY JUDGMENT/SUMMARY ADJUDICATION

1 │ analogous to the federal claims here – and applies for the purpose of laches. *Miller,* 454 F.3d at

2 │ 942 n.11.  Knoll learned of Alphaville's sale of the allegedly infringing furniture at least as early

3 │ as August 19, 2003.  Yahoo Store Website at p. 1.  Nonetheless, Knoll waited almost exactly

4 │ four years – until August 15, 2007 – to even send a cease-and-desist letter to Alphaville.  Lee

5 │ Decl. at ¶ 15.  More important, Knoll did not initiate a lawsuit based on its alleged rights until

6 │ September 7, 2007 and did not name Alphaville in that suit until two months later.  *Id.* at ¶ 16.

7 │ As Knoll's suit was not initiated until over four years after it became aware of Alphaville's

8 │ alleged infringement, and after the limitations period had run, each of Knoll's counterclaims is

9 │ presumed barred by laches.

10 │

11 │

12 │ **REDACTED**

13 │

14 │

15 │

16 │

17 │     Even if the Designs were to function as trademarks, they are weak at best.  The strength

18 │ of a trademark is evaluated in terms of conceptual strength and commercial strength.  *Id..*  Even a

19 │ conceptually strong mark is rendered weak by significant third party use.  *Matrix Motor Co., Inc.*

20 │ *v. Toyota Jidosha Kabushiki Kaisha,* 290 F. Supp.2d 1083, 1091 (C.D. Ca. 2003).  When

21 │ numerous sellers of a product line use similar marks, the distinctiveness of the mark to

22 │ consumers is blurred.  *See GoTo.com, Inc.,* 202 F.2d at 1207.  Accordingly, in a crowded field, a

23 │ user of a mark is relatively "weak" in its ability to prevent competitors from using the mark.

24 │ *PostX Corp. v. docSpace Co., Inc.,* 80 F. Supp.2d 1056, 1061 (N.D. Ca. 1999).  For decades,

25 │ numerous competitors have produced furniture based on the Designs, including the Palazzetti

26 │ Defendants and others who all continue to produce and sell such furniture today.  Vitra Book at

27 │ Alphaville000245 & 355; Green Decl. at ¶¶ 10, 12-16 & 27 and Exhibits 3-6 & 16 thereto.

28 │ **REDACTED**

**REDACTED**

Hakemian Letter at pp.

1-2. The Designs, if they function as trademarks at all, are very weak.

Second, and most important, Knoll has wholly failed to enforce its alleged rights in the Designs. In the 1930s, shortly after Mies created the Designs, a number of manufacturers were producing the Brno Chair and items from the Barcelona Collection. Vitra Book at

**REDACTED**

2 thereto. In fact, three such manufacturers continue to sell furniture based on the Designs even after lawsuits against them asserted they infringed the Designs. *See* Exhibit 16 to Green Decl.

Third, Knoll will not be substantially harmed if its claims are denied. The Designs have been used by huge number of others virtually from their creation through the present, Knoll has failed to diligently prevent others from using the Designs over the last 40 years and, in fact,

**REDACTED**

12-16. Knoll has operated and continues to operate successfully and profitably over the years despite the use of the Designs by others and will not be harmed if its claims against Alphaville are denied. Exhibit 1 to Lee Decl. Alphaville's sales, while vital to it, are a drop in the bucket to Knoll in light of the multitudes selling similar furniture.

Fourth, Alphaville acted in good faith when it began production of its Bauhaus style furniture. Alphaville's founder entered the business after he saw and was aware that numerous entities other than Knoll were producing and selling furniture based on the Designs. Lee Decl. at ¶¶ 7, 12-14, 30, 31 & 34. When Alphaville began producing its Bauhaus style furniture, Knoll had not yet even applied for registration of the Designs and was not aware of Knoll's asserted rights in the Designs. Lee Decl. at ¶¶ 3, 8 & 35. *See* Exhibits 19-23 to Green Decl. Since its

1  founding, Alphaville has attempted not to use the "Barcelona" as a trademark.  Although

2  inadvertent trademark use of the term may have occurred in that time, Alphaville has not made

3  trademark use of "Barcelona" since this suit began.  Lee Decl. at ¶¶ 23-24.

4        Fifth, although there is competition between Alphaville and Knoll, only because both are

5  in the furniture business, the parties' customers are somewhat different and Knoll has educated

6  the market about the differences.  That is, Alphaville's furniture is less expensive than Knoll's

7  and is not held out as "original" Mies designs approved by Mies.  Lee Decl. at ¶¶ 27-28.  Knoll's

8  customers are seeking high-end, "designer" furniture that has the cache and status associated

9  with owning a Mies original.  Alphaville's furniture retailer customers and the ultimate

10  consumers of its furniture are seeking Bauhaus style furniture without the price tag or status

11  associated with an "original."  *See id.* at ¶¶ 24, 37 & 38.  Accordingly, although the parties'

12  compete in the marketplace, their core consumers are quite different.

13        Finally, Alphaville has been and will continue to be seriously harmed by Knoll's delay in

## REDACTED

17  Decl. at ¶ 28.  Between 2003 and 2007, Alphaville cultivated numerous customers for its

18  Expedition line.  *Id.* at ¶¶ 6, 10-11 & 17.  Further, since its founding Alphaville has built an

19  excellent reputation in the furniture industry, in large part based on its Expedition furniture.  *Id.*

20

21

22

23

24

25

26

27

28

## REDACTED

MPA IN SUPPORT OF ALPHAVILLE'S MOTION FOR
SUMMARY JUDGMENT/SUMMARY ADJUDICATION

3.   Alphaville Has Suffered And Will Continue To Suffer Substantial Prejudice Caused By Knoll's Delay.

Alphaville has suffered and will suffer prejudice as a result of Knoll's delay in asserting it purported rights. *Saul Zaentz Co.* 2008 WL 2949423, at *18 (citing *NAACP v. NAACP Legal Defense & Education Fund, Inc.*, 753 F.2d 131, 138-39 (D.C. Cir. 1985)). Prejudice in a case such as this includes both "expectations-based prejudice" derived from "a defendant [taking] actions or [suffering] consequences that it would not have, had the plaintiff brought suit promptly" and "evidentiary prejudice such as lost, stale or degraded evidence, or witnesses whose memories have faded[.]" *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 955 (9th Cir. 2001). Expectations prejudice, for example, includes any labor and capital invested to build the reputation and goodwill of a mark or to expand one's business and business transactions entered into in reliance on and during the delay. *Saul Zaentz Co.* 2008 WL 2949423, at *18.

The economic prejudice to Alphaville has been and will continue to be severe if it now loses the ability to produce its Expedition furniture, a business it built during Knoll's delay in asserting its alleged rights in the Designs. As described in Sections IIE & IIIA2_ above,

REDACTED

1

# REDACTED

2

3

**B.**   **The Designs Have Not Acquired Secondary Meaning and are Not Subject to Trademark Protection.**

5

6   The Designs have not acquired secondary meaning as identifying Knoll and, therefore,

7   are not subject to trademark protection.  Product designs are not inherently distinctive.  *Wal-Mart*

8   *Stores, Inc. v. Samara Brothers, Inc.*, 529 U.S. 205, 214 (2000).  Instead, product designs are

9   deserving of trademark protection only if secondary meaning is established.  *Id.* at 215.

10   Here, the Designs are furniture designs and, by their very essence, are product designs

11   which cannot serve as trademarks unless secondary meaning is shown.  *See id.*  In 2004, Knoll

12   obtained trademark registrations for the Designs.  The Magnusson Declarations submitted in

13   support of Knoll's applications included information purported to substantiate that the Designs

14   had acquired secondary meaning, including that the public has come to refer to the furniture as,

15   for example, the Barcelona Chair, information regarding Knoll's advertisement of the products

16   and exhibits suggesting that Knoll is the source of those products.  Magnusson Decl. at ¶¶ 4, 6-0,

17   12, 14 & 15.  Since secondary meaning is required for registration of product design trade dress,

18   it appears that Knoll obtained registration of the Designs based on these representations.

19   Although federally registered trademarks are presumptively distinctive, the presumption

20   may be overcome by a showing that the registered mark has not acquired secondary meaning. [4]

21   *Americana Trading Inc. v. Russ Berrie & Co.*, 966 F.2d 1284, 1287 (9th Cir. 1992).  Third party

22   use of a mark on similar or related products negates secondary meaning.  *Secular Organizations*

23   *for Sobriety, Inc. v. Ullrich*, 213 F.3d 1125, 1130 (9th Cir. 2000) (defendant did not establish

24   secondary meaning where its use of a mark was neither exclusive nor lengthy); *EFS Mktg. v.*

25   *Russ Berrie & Co.*, 76 F.3d 487, 491(2d Cir. 1996) (a "troll doll" design had not acquired

26

---

27   [4]  Once the presumption is rebutted, the burden of proof of secondary meaning reverts to the registrant.  *Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 690 (6th Cir. 1989).

28

1  secondary meaning when at least twenty other companies sold dolls of similar design); *Carter-*

2  *Wallace, Inc. v. Proctor & Gamble Co.*, 434 F.2d 794, 802 (9th Cir. 1970) (use of SURE by other

3  manufacturers for related or identical products mitigated against a finding of secondary

4  meaning).

5        Since the 1930s and continuing to the present, numerous third parties have manufactured

6  furniture based on the Designs. For example, in the 1930s, Gratz Industries of New York

7  produced an entire range of "Barcelona" furniture and the Brno Chair. Vitra Book at

8  ALpahville000245 & 355. The Palazzetti Defendants and others have for many years sold and

9  continue to sell furniture based on the Designs. Lee Decl. at ¶¶ 25 & 33 and Exhibit 2 thereto;

10  Green Decl. at ¶¶ 10, 12 & 17 and Exhibits 3 & 16  Accordingly, third party use of the Designs

11  is widespread, and Knoll's use certainly is not and never has been exclusive.

12  REDACTED                                   Hakemian Letter at pp. 1-

13  2. Such widespread use precludes secondary meaning. Therefore, Knoll simply has no

14  trademark rights in the Designs and its claims based on the Designs should be dismissed.

15  **C.**    **Alphaville has Not Infringed and is Not Infringing BARCELONA.**

16        Knoll asserts that Alphaville has infringed its mark BARCELONA. However,

17  any claims Knoll might have against Alphaville regarding the BARCELONA mark are barred by

18  the doctrine of laches, are moot, and must fail in light of the weak rights, if any, of Knoll in the

19  term "Barcelona." Moreover, the use Alphaville makes is not trademark use.

20        First, Knoll learned of Alphaville's purported use of the BARCELONA mark in

21  August 2003 when Knoll obtained a printout of Alphaville's advertisement and sales offering on

22  its Yahoo stores website. Yahoo Stores Website at pp. 1-2. Nonetheless, Knoll did not assert its

23  claims against Alphaville until November 2007, over two months after the statute of limitations

24  had run. Lee Decl. at ¶ 15; Smith Decl. at ¶ 16. Accordingly, as with the Designs described in

25  Section IIIA above, laches similarly bars Knolls claims as to the BARCELONA mark.

26        Second, from its inception, Alphaville avoided use of the "Barcelona" term in any

27  trademark sense and used it simply in the generic and nominative fair use sense for which it has

28  come to be known by the public. Alphaville admittedly made occasional and inadvertent

MPA IN SUPPORT OF ALPHAVILLE'S MOTION FOR
SUMMARY JUDGMENT/SUMMARY ADJUDICATION

1 trademark use of the "Barcelona" term early in the life of the company. However, Alphaville

2 was careful not to make such use as soon as it learned of Knoll's registration of BARCELONA

3 and has not made any use of Barcelona other than generic and descriptive use at least since this

4 lawsuit was initiated. Lee Decl. at ¶¶ 23-24. Alphaville is not infringing the BARCELONA

5 mark and Knoll's counterclaims as to BARCELONA are moot.

6         Finally, any rights Knoll might have in BARCELONA are weak at best. The

7 "Barcelona" term is widely used in the furniture industry by numerous manufacturers other than

8 Knoll. *See* Exhibit 2 to Lee Decl. Such widespread third party use weakens a mark to such an

9 extent that a trademark holder loses the ability to enforce rights in the mark against others. *Wal-*

10 *Mart Stores, Inc.*, 539 U.S. at 214-15. Here, the mark is not only weak but it has become part of

11 the common parlance and generic for the furniture at issue.

12

13 # REDACTED

14

15

16 Moreover, the fact that the term "Barcelona" or "Barcelona Chair" has become genericized is

17 evidenced by the entry in the dictionary for "Barcelona Chair", which states: "an armless chair

18 with leather-covered cushions on a stainless steel frame." Smith Decl. at ¶ 31 and Exhibit NAS-

19 8 thereto. Knoll can't take the word out of the dictionary and thereby try to regain rights in it.

20 **D.**     **Knoll's Design Registrations are Invalid Because They Were Acquired By Fraud On**
        **The United States Patent & Trademark Office.**

21

22         Knoll's registrations of, and ultimately its rights in, the Designs are invalid because Knoll

23 misrepresented the facts to the PTO in obtaining them. *See Medinol Ltd.*, 67 U.S.P.Q.2d at 1208

24 ("if fraud can be shown in the procurement of a registration, the entire resulting registration is

25 void"). "[T]he obligation which the Lanham Act imposes on an applicant is that he will not

26 make *knowingly* inaccurate or *knowingly* misleading statements in the verified declaration

27 forming a part of the application for registration." *Bart Schwartz International Textile, Ltd. v.*

28 *Federal Trade Commission*, 289 F.2d 665, 669 (CCPA 1961).

1  Fraud on the PTO requires that the statement be false, the statement or failure to disclose

2  be of material information which would or should result in the rejection of the application had

3  the information been disclosed, and that the applicant knew or should have known the fact

4  represented was false. *Torres v. Cantine Torresella S.r.l.,* 808 F.2d 56, 59 (Fed. Cir. 1986);

5  *Morehouse Mfg. Corp. v. J. Strickland & Co.,* 407 F.2d 881, 886 (CCPA 1969); *Maids to Order*

6  *Inc. v. Maid-to-Order Inc.,* 78 U.S.P.Q.2d 1899, 1905 (TTAB 2006). *See Robi v. Five Platters,*

7  *Inc.,* 918 F.2d 1439, 1444 (9th Cir. 1990). The appropriate inquiry is not into the registrant's

8  subjective intent but into the objective manifestations of that intent since intent must often be

9  inferred from the circumstances and the statement made by the affiant. *Medinol Ltd.,* 67

10 U.S.P.Q.2d at 1209.

11  Here, Knoll fraudulently represented in its application that no other party had the right to

12 use the Designs and that the Designs were not subject to patent protection or applications.

13 Accordingly, its registrations are invalid. Similarly, because of the materiality of the

14 representations to the existence of Knoll's rights in the Designs, these representations also

15 evidence that Knoll does not have trademark rights in the Designs regardless of registration.

16  1.  <u>Knoll's Representation That It Had Exclusive Right To Use The Designs Was
       Knowingly False.</u>

17

18  Knoll fraudulently represented to the PTO in 2003 that, to the best of its knowledge or

19 belief, no other entity had a right to use the Designs. An applicant need not disclose to the PTO

20 the existence of users whose use infringes the applicant's rights in a mark. *Dial-A-Mattress*

21 *Operating Corp. v. Mattress Madness, Inc.,* 841 F. Supp. 1339, 1354 (E.D.N.Y. 1994); *Maids to*

22 *Order of Ohio Inc.,* 78 U.S.P.Q.2d at 1907 (if a person's rights are not known by the applicant to

23 be superior or clearly established, the applicant has a reasonable basis for believing others do not

24 have a right to use the mark); *Western Worldwide Enterprises Group Inc. v. Qinqdao Brewery,*

25 17 U.S.P.Q.2d 1137, 1141 (TTAB 1990) (where affiant stated it had exclusive use of mark in

26 light of other uses that were insufficient to negate substantially exclusive use by the affiant, no

27 fraud occurred). However, an oath made in support of an application must be truthful. *Marshal*

28 *Fields & Co. v. Mrs. Fields Cookies,* 11 U.S.P.Q.2d 1355, 1357 (TTAB 1989). In *Marshall*

1  *Fields & Co.*, the Trademark Board addressed a situation in which the registrant submitted an

2  affidavit by the Chairman of Marshall Fields & Co. under Section 2(f) of the Lanham Act stating

3  that its use of the mark was exclusive and continuous. At the time, the Chairman was aware of at

4  least three other entities using marks that included the term FIELDS for services identical or

5  related to those of Marshall Fields. *Marshall Fields & Co.*, 11 U.S.P.Q.2d at 1357.

> 6   [T]he oath . . . must be truthful, and if it is shown that no reasonable person
>     knowingly could represent that its use of a mark was "substantially exclusive," the
> 7   signing of a declaration attesting to so material a representation would, in our
>     opinion, if relied upon by the Examiner, constitute fraud on the Patent Office. . . .
> 8   [T]he purpose of a Section 2(f) affidavit is to persuade the Examiner that a mark
>     otherwise not entitled to a Principal Register registration has acquired sufficient
> 9   distinctiveness through widespread use by the applicant in commerce such that
>     the mark now designates only one source of origin. In this later context, the
> 10  existence of numerous third-party users of a mark, even if junior, might well have
>     a material impact on the Examiner's decision to accept a party's claim of
> 11  distinctiveness.

12  *Id.* at 1357-58.

13        In 2003, Mr. Magnusson executed the POAs as a representative of Knoll and in support

14  of Knoll's applications for registration of the Designs. He stated under oath therein that no other

15  entity had a right to use the Designs. POAs at p. 1. At that time, however, numerous third

16  parties were producing furniture based on the Designs and had been doing so for decades. *See*

17  Section IIC above. Given Knoll's widespread permission of third party use for so long a period,

18  Knoll knew it did not have exclusive right to use the Designs.

19

20                         **REDACTED**

21

22                         Knoll's statement, therefore, simply was false. The

23  statement also was material. Secondary meaning is necessary to acquire trade dress rights in and

24  registration of a product design. *Wal-Mart Stores, Inc.*, 529 U.S. at 214-15. Exclusive use is

25  critical to a showing of secondary meaning. *Id.* As in *Marshall Fields & Co.*, Knoll's

26  representation was one necessary to attaining registration of the Designs and one that would have

27  materially impacted the PTO's decision to grant registration. Further, the misrepresentation was

28  made willfully. Mr. Magnusson executed the POAs as the representative of Knoll. In 2003, he

1  surely knew about the long and widespread use of the Designs by third parties, including the

2  Palazzetti Defendants and others. *See* Exhibits 19-23 to Green Decl. Moreover, even if he did

3  not have actual knowledge, as Knoll's representative for this purpose, Mr. Magnusson certainly

4  should have known of that use and of Knoll's own acknowledgement of such use, and would

5  have known of it had he made the simplest of inquiries. *Id.* Accordingly, the registrations of the

6  Designs were obtained by false statement to the PTO and are void. In addition, in light of such

7  widespread third party use, Knoll cannot establish secondary meaning and does not have rights

8  in the Designs regardless of registration.

9        2.    Knoll's Representation That The Designs Were Not Subject To Patent Protection
             Or Applications Also Was Untrue.

10

11       Knoll also fraudulently stated to the PTO that the Designs were not subject to patent

12  protection or applications. Trade dress protection is not available for product features that are

13  functional. *Qualitex Co. v. Jacobson Products Co.*, 314 U.S. 159, 164-65 (1995). "A utility

14  patent is strong evidence that the features therein claimed are functional. If trade dress

15  protection is sought for those features the strong evidence of functionality based on the previous

16  patent adds great weight to the statutory presumption that features are deemed functional until

17  proved otherwise by the party seeking trade dress protection." *Traffix Devices, Inc. v. Marketing*

18  *Displays, Inc.*, 532 U.S. 23, 29 (2001). A product feature is functional " if it is essential to the

19  use or purpose of the article or if it affects the cost or quality of the article." *Qualitex Co.*, 314

20  U.S. at 165. The functionality doctrine prevents trademark law from inhibiting competition by

21  allowing a producer to control a useful product feature. *Id.* "It is the province of patent law, not

22  trademark law, to encourage invention by granting inventors a monopoly over new product

23  designs or functions for a limited time after which competitors are free to use the innovation. If

24  a product's functional features could be used as trademarks, however, a monopoly over such

25  features could be obtained without regard to whether they qualify as patents and could be

26  extended forever[ ]." *Id.* at 164-65. "Functional features of a product are features 'which

27  constitute the actual benefits that the consumer wishes to purchase, as distinguished from an

28  assurance that a particular entity made, sponsored or endorsed a product.'" *Rachel v. Banana*

1   *Republic, Inc.,* 831 F.2d 1503, 1506 (9th Cir. 1987) (citing *Vuitton et Fils S.A.  v. J. Young*

2   *Enters., Inc.,* 644 F.2d 769, 774 (9th Cir. 1981)).

3          In his declarations in support of Knoll's Design applications, Mr. Magnusson stated that

4   the Designs were not subject to any patent protection or application.  Magnusson Decl. at ¶ 16;

5   Exhibits 19-23 to Green Decl.  However, this statement was known by Mr. Magnusson to be

6   misleading and that several patents were at least relevant and therefore material to the PTO's

7   decision to issue the registrations.

8

9

10

11

12

13   **REDACTED**

14

15

16

17

18

19

20          *See also* Vitra Book at Alphaville000384 & 403; MOMA Book at Alphaville000211, 214,

21   216 & 219.  The Brno Chair was designed with a linear front to allow it to be placed close to

22   tables, the flat steel of the base of the Barcelona Table is placed to provide maximum strength

23   and the Barcelona Couch is designed to allow for users to change position easily on it.  *See* Vitra

24   Book at Alphaville000339, 403 & 415.  These functional features are all part of the Designs and

25   are features of benefit to consumers, essential to the comfort and strength of the products and

26   that serve to enhance the products' **REDACTED**

27                                                                                  the PTO would have inquired

28   further into the issue of functionality during the application process.  *Trademark Manual of*

1    *Examining Procedure ("TMEP")* at § 1202.02(a)(v)

2

3                         **REDACTED**

4

5    misrepresentation here was both knowing and material, thus invalidating Knoll's registrations

6    and, due to the functional nature of the Designs, invalidating any trade dress rights Knoll

7    purports to have in the Designs.  If there is a judgment to be made about the applicability of

8    individual patents, it is for the PTO to make.

9                         **IV.   CONCLUSION**

10          For the foregoing reasons, Alphaville respectfully requests that this Court enter an order

11   that:  (1) Knoll does not have exclusive trademark rights in the Designs; (2) Knoll's registrations

12   of the Designs are void and canceled; (3) Alphaville is not making trademark use of the

13   trademark BARCELONA; and (4) summary judgment is granted in Alphaville's favor on all

14   claims and counterclaims in this action.

15   Dated: November ___, 2008                    Respectfully submitted

16

17                                                      /NAS/
                                                 Neil A. Smith
18
                                                 Attorneys for Plaintiff/Counter-
19                                               Defendant Alphaville Design, Inc.

20

21

22

23

24

25

26

27

28

MPA IN SUPPORT OF ALPHAVILLE.'S MOTION FOR
SUMMARY JUDGMENT/SUMMARY ADJUDICATION