United States District Court

For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ALPHAVILLE DESIGN, INC.,

      Plaintiff,

  v.

KNOLL, INC.,

      Defendant,
_____

AND RELATED COUNTERCLAIMS.
_____/

No. C 07-05569 MHP

**MEMORANDUM & ORDER**

**Re: Cross-Motions for Partial Summary Judgment**

    Alphaville Design, Inc. ("Alphaville") brought this declaratory judgment action against Knoll, Inc. ("Knoll"), requesting judgment that Knoll is without right to maintain suit against Alphaville for the infringement of certain trademarks. Knoll counterclaimed with a claim of trademark infringement and several related claims. Now before the court are cross-motions for partial summary judgment. Alphaville moves for summary judgment that Knoll's marks are not valid trademarks. Knoll moves for summary judgment against portions of Alphaville's affirmative defenses to the counterclaims. Having considered the parties' arguments and submissions, the court enters the following memorandum and order.

BACKGROUND

I.      The Parties

Plaintiff and counter-defendant Alphaville is a corporation that, since 2003, has sold early-to-mid twentieth century Bauhaus style furniture.  Counter-defendants David and Peggy Lee operate Alphaville.  David Lee is president of the corporation.  Defendant and counter-claimant Knoll is a manufacturer and marketer of modern furniture.  Its predecessor in interest was founded in 1938 by a German-American immigrant.  Like Alphaville, Knoll sells Bauhaus style furniture.

II.     The Barcelona Collection

Ludwig Mies van der Rohe ("Mies") was an architect of the early twentieth century Bauhaus school.  Born in Aachen, Germany, he emigrated to the United States in 1937.  While working as an architect in Germany, Mies was asked to design the German pavilion for the 1929 Barcelona International Exhibition.  In addition to designing the building itself, Mies designed the furniture to be placed inside the building, including a chair and a stool.  These items of furniture came to be known as the "Barcelona Chair" and "Barcelona Stool."  At about the same time, Mies designed a house in Brno, Czechoslovakia, for Grete and Fritz Tugendhat.  He designed furniture for the Tugendhat house, which included a chair known as the "Flat Brno Chair" and a table that later came to be known as the "Barcelona Table."  In 1930, Mies designed a couch or daybed which became known as the "Barcelona Couch."  For the sake of convenience, these five items of furniture will be referred to as the "Barcelona collection."

III.    Patents for Pieces in the Barcelona Collection

In 1929, the German patent office issued Mies a patent (Patentschrift Nr. 486722) for a chair made of metal rails linked crosswise as supporting elements ("the German patent").  The patent specification included a figure of a chair substantially identical in appearance to the Barcelona Chair as well as frame configurations present in both the Barcelona Chair and the Barcelona Stool.  Green Moving Dec., Exh. 1.  In 1931, the Spanish patent office issued Mies a patent for a chair in which

2

1  the frame of the seat is formed by two or more independent elastic springs ("the Spanish patent").  In

2  1942, the U.S. Patent Office issued Mies a patent (No. 2,283,755) for various designs of the "C"

3  shaped springs ultimately used in the Brno Chair ("the U.S. patent").  Accompanying illustrations

4  displayed a chair substantially similar to what has become known as the Brno chair.

5

6  IV.    Knoll's Agreements with Mies

7        In 1953, Mies signed a letter purporting to give an exclusive license to Knoll's predecessor

8  in interest for the manufacture and sale of the Barcelona Chair and Barcelona Stool in the United

9  States, Canada, France, Germany, and Belgium.  Weaver Dec., Exh. 2.  In 1959, this agreement was

10 expanded to include the Brno Chair.  Id., Exh. 3.  In November 1965, Mies and Knoll's predecessor

11 entered into a letter agreement ("the 1965 agreement") stating, among other things, that Mies did

12 "hereby sell, assign, and convey all of [his] right, title and interest in [his] designs and the exclusive

13 use of [his] name in connection with the sale in the United States and elsewhere, of the furniture

14 identified in Exhibit 1 [including the designs at issue in this case]."  As consideration, Knoll's

15 predecessor agreed to pay Mies a flat fee of $150,000 over the following ten-year period.  Id., Exh.

16 4.

17 V.     The BARCELONA Mark

18       It is undisputed that Knoll and its predecessors have continuously sold the pieces in the

19 Barcelona collection since before the time of the 1965 agreement.  Knoll offered items for sale under

20 the "BARCELONA" name from at least 1953.  Needle Dec. ¶ 9.  Knoll was assigned a federal

21 trademark registration for "BARCELONA" in March 1968.  Misthal Dec. ¶ 103 & Exh. 86.  In late

22 1968, following acquisition of the mark, the lawyers of Knoll's predecessor sent several cease and

23 desist letters to furniture sellers who were advertising their merchandise as original Mies Barcelona

24 chairs.  See, e.g., Wilson Opp. Dec., Exh. 9; Green Dec., Exh. 4.  The letters objected to the use of

25 the words "original" and "Barcelona."  In at least some cases, the recipients of the letters agreed to

26 stop advertising their products in this manner.  See, e.g., Wilson Opp. Dec. at 8 & 9.  There are no

27 cease and desist letters in the record from 1968 to 2000.  In May 2000, Knoll's general counsel sent

28

United States District Court

For the Northern District of California

3

a letter to Palazetti, a furniture retailer, requesting that the latter cease using the BARCELONA

trademark in its literature.  Id., Exh. 11.


VI.     The Designs

        The 1968 cease and desist letters objected to the use of the terms "original" and

"BARCELONA" but did not object to the sale of furniture based on the Mies designs of the

Barcelona Chair and Barcelona Stool.  Indeed, in November 1968, the Vice President for Marketing

of Knoll's predecessor drafted a letter in response to a customer stating, "The Barcelona chair was

originally designed by Mies van der Rohe before 1930.  The visual design as such, is in the public

domain by this point and time.  We have the exclusive rights from Mies van der Rohe to

manufacture his designs and to use his name in connection with them."  Green Moving Dec., Exh. 4.

The copy of this letter in the record is dated November 25 but is unsigned.

        In February 1990, Knoll's Executive Vice President for Design sent a letter to the New York

Museum of Modern Art (MoMA) proposing several steps "as a means of expanding public and

industry awareness of our relationship with the Museum and exclusive rights to the Mies Archive

Reproductions."  Green Moving Dec., Exh. 27.  Knoll noted that, "In taking these steps, Knoll

intends to differentiate our Mies Collection from the numerous copies sold at lower price levels and

without restriction, by companies having no royalty obligations."  Id.

        In June 1991, a KnollStudio employee wrote to a potential customer to convince it to

purchase the Knoll Brno Chair for its corporate cafeteria.  She wrote that the purpose of her letter

was "to make it clear in writing what makes the Knoll Brno chair superior to the unauthorized copies

on the market."  Id., Exh. 28.  After describing the Knoll Bruno Chair's distinguishing

characteristics, she wrote, "No Brno copy on the market is manufactured to these specifications."

Id.

        Alphaville has filed many dozens of pages of printouts of websites that sell or distribute low-

cost reproductions of the Barcelona collection designs.  See Lee Moving Dec., Exh. 2.  Additionally,

many retailers currently sell the designs, sometimes even referring to them with the "Barcelona"

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1   label.  See Supp. Lee Dec. ¶¶ 4-8 (and accompanying exhibits) (describing and showing pictures of

2   Barcelona chair and stool reproductions currently on sale in stores); ¶ 10 (list of websites); see, e.g.,

3   efstyle.com (offering for sale a "Barcelona Famous Design Black Leather Chair" for $639.00) (as

4   visited June 2, 2009, and available in the court's files).  Some websites cited by Lee refer to items

5   using the "Barcelona" label that are plainly not based on the Mies designs.

6          Knoll, meanwhile, has made prominent use of the Barcelona Chair and the other designs for

7   many years.  This includes the use of the designs in paid advertising and other promotional pieces,

8   and in showrooms worldwide.  See, e.g, Needle Dec. ¶¶ 17-36 (and accompanying exhibits).  Since

9   1998, KnollStudio has spent an average of $250,000 per year promoting the products it offers for

10  sale, some subset of which comprises the Barcelona collection.  Needles Dec. ¶ 16.  From 1998

11  through June 2003, Knoll sold more than 2,800 units of the Barcelona Chair, resulting in sales of

12  over $8.5 million.  Magnusson Dec., Exh. B ¶ 9.  The retail price of the Barcelona Chair was $7000-

13  8000 per chair.  Id. ¶ 16.

14

15  V.     Trademark Registrations of the Designs

16         In 2003, Knoll filed trademark applications with the U.S. Patent and Trademark Office

17  (USPTO).  These applications sought trademarks for drawings representing the five designs at issue.

18  Carl G. Magnusson, Knoll's Executive Vice President for Design, reviewed and signed a declaration

19  supporting each of these applications.  Magnusson Dec. ¶ 8.  In each application, Magnusson

20  declared that (1) "no other person, firm, corporation or association has the right to use said mark in

21  commerce," and (2) the design "is not subject to any patent protection or application."  Id., Exh. B.

22  Terence Riley, Chief Curator of Architecture and Design at the MoMA, also submitted a declaration

23  with the application.  Green Moving Dec., Exh. 13.  Riley's declaration incorporates an excerpt from

24  Ludwig Glaser's exhibition catalogue entitled "Ludwig Mies van der Rohe: Furniture and

25  Drawings" and published by MoMA (hereinafter "the MoMA book").  Id. at ¶ 6. The MoMA book

26  also contains portions describing earlier Mies patents, but those portions were not included in the

27  application.  The USPTO granted the trademarks in October 2004, and the decision was reported in

28

5

*The New York Times*, *The San Francisco Chronicle*, and other newspapers.  Needles Dec., Exhs. 84-86.

V.    Interactions Between Knoll and Alphaville

As of August 2003, Alphaville was selling furniture based on all five of the Barcelona collection designs on its Yahoo! website.  Knoll produced a printout from this website, with the title "Modern Classic Furniture by Alphaville Design," dated August 19, 2003.  An unknown hand had circled the words "Alphaville Design" and written "#2 on yahoo."  Green Dec., Exh. 15.  The web page lists the price for "Barcelona Chair & Ottoman Set" at $895.  Id.

On August 17, 2007, Knoll sent Alphaville a cease and desist letter demanding that Alphaville cease selling furniture based on the Mies designs.  Lee Dec. ¶ 15.  On September 7, 2007, Knoll filed suit against Danrick Commerce Group, based on its sale of Alphaville's allegedly infringing furniture.  On November 7, 2007, Knoll named Alphaville in the action.  Knoll later voluntarily dismissed that action.

VI.    Relevant Procedural History

Alphaville filed the instant declaratory judgment action on November 1, 2007.  Knoll answered and counterclaimed on January 15, 2008, and Alphaville answered the counter-claims on February 22, 2008.  At a July 21, 2008, status conference, the court invited motions for summary judgment regarding invalidity/validity.  The instant cross-motions were filed in early November 2008, and the court heard oral argument on February 2, 2009.

LEGAL STANDARD

Summary judgment may be granted only when, drawing all inferences and resolving all doubts in favor of the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); see generally Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-255 (1986).  A material fact is "genuine" if the evidence is

such that a reasonable jury could return a verdict for the non-moving party.  Anderson at 248.  The

moving party bears the burden of identifying those portions of the pleadings, discovery and

affidavits that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett,

477 U.S. 317, 323 (1986).  Once the moving party meets its initial burden, the non-moving party

must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts

showing that there is a genuine issue for trial.  Fed R. Civ. P. 56(e); see Anderson at 250.

DISCUSSION

I.        Secondary Meaning of the Designs

Alphaville argues that the designs have no secondary meaning and cannot, therefore, receive

the protection of the trademark laws.  Under the Lanham Act, a trademark must, among other things,

"distinguish [a producer's] goods . . . from those manufactured or sold by others."  15 U.S.C. ¶ 1127.

Writing for a unanimous Supreme Court, Justice Scalia has explained that a mark can be distinctive

in one of two ways: It may identify a particular source as part of its intrinsic nature, or it may have

acquired distinctiveness by developing a secondary meaning.  Wal-Mart Stores v. Samara Bros.,

Inc., 529 U.S. 205, 210 (2000).  An arbitrary, fanciful or suggestive mark is inherently distinctive.

Id. at 210-211; see also AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341, 349 (9th Cir. 1979).  A product

design, on the other hand, is not inherently distinctive, and it cannot be protected by trademark law

without a showing of secondary meaning.  Wal-Mart at 212-214.  In Wal-Mart, an unregistered mark

was at issue, and the party asserting the trademark had the burden of proving secondary meaning.

Registration of a trademark carries with it a presumption of validity; therefore, the party challenging

the validity of a registered trademark has the burden of establishing the absence of secondary

meaning.  See id. at 209.

The term "secondary meaning" initially arose in the context of word marks having an

ordinary meaning that then acquired a second meaning associating the product with a particular

source.  See id. at 211 n.*.  For example, the producer of "Best Milk" might invest in commercials to

build up an identification of the word "Best" with its milk such that consumers would understand

7

"Best Milk" to mean a particular brand, rather than merely a statement about the quality of the milk. See McCarthy on Trademarks § 15:6 (using this example).  In the case of non-word marks, secondary meaning is a misnomer, and the Court suggested that "acquired meaning" would be more appropriate.  Wal-Mart at 211 n.*.

Whether a particular trademark or trade dress has come to have a secondary meaning is a question of fact.  See Vision Sports, Inc. v. Melville Corp., 888 F.2d 609, 614 (9th Cir. 1989).[1]  The trademark acquires secondary meaning "when the purchasing public associates [it] with a particular source."  Id. at 615, citing Fuddruckers, Inc. v. Doc's B.R. Others, Inc., 826 F.2d 837, 843 (9th Cir. 1987).  The factors to be assessed in determining secondary meaning include: (1) whether purchasers associate the trademark with a single, though anonymous, source; (2) the degree and manner of the trademark holder's use of the mark; and (3) whether the trademark holder's use of the mark has been exclusive.  See Vision Sports at 615; Maljack Productions, Inc. v. GoodTimes Home Video Corp., 81 F.3d 881, 887 (9th Cir. 1996) (holding that secondary meaning for a movie title required proof only "that the public associates the title with a single source, even if that source is anonymous").[2]

In this case, there is little direct evidence that the public does or does not associate the designs of the respective pieces in the Barcelona collection with Knoll or with a single, anonymous source.  "An expert survey of purchasers can provide the most persuasive evidence of secondary meaning."  Vision Sports at 615 (citation omitted).  Alphaville has provided neither consumer surveys or direct consumer testimony.  (Nor has Knoll.)

Consumer confusion can serve as an indirect indication that a design has secondary meaning.  If consumers report having been tricked into buying an imitation, thinking that a product with a certain design is authentic because of that design, then such reports provide persuasive evidence that the design has secondary meaning.  The record appears to reveal only one incident in which a customer apparently bought an Alphaville chair and then later realized it was a "fake."  Misthal Dec., Exh. 72 (terse e-mail).  There is a great difference in cost and (Knoll asserts) quality among the Knoll merchandise and the various unauthorized reproductions.  This suggests that consumers

United States District Court

For the Northern District of California

generally know the difference between the Knoll chair and a reproduction.  The fact that so many outlets continue to sell reproductions could therefore be attributable to one of two reasons.  It may be the case that consumers are merely attracted to the style of the chair, which has become unmoored from any secondary association with Knoll.  As Sigmund Freud is reputed to have remarked, "Sometimes a cigar is just a cigar."  See Wal-Mart, 529 U.S. at 213 ("Consumers are aware of the reality that, almost invariably, even the most unusual of product designs—such as a cocktail shaker shaped like a penguin—is intended not to identify the source, but to render the product itself more useful or more appealing.").  Conversely, it could be the case that consumers purchase the reproductions, as in the case of a "knockoff" Rolex or Gucci purse, so that others will believe they own an expensive original design.  The former scenario would suggest little or no secondary meaning, while the latter would suggest strong secondary meaning.  As should be plain, in the absence of any direct consumer survey evidence, determining which of these scenarios most accurately reflects reality amounts to little more than speculation.

Knoll relies upon Carol Cable Co. v. Grand Auto, Inc., 4 U.S.P.Q2d 1056 (N.D. Cal. 1987) (Patel, J.), for the proposition that secondary meaning may be inferred from copying since "there is no logical reason for the precise copying save an attempt to realize upon a secondary meaning that is in existence."  Id. at 1060, quoting Audio Fidelity, Inc. v. High Fidelity Recordings, Inc., 283 F.2d 551 (9th Cir. 1960).  Normally, proof of copying "strongly supports an inference of secondary meaning."  Vision Sports at 615.  However, the case at bar differs in an important way from Carol Cable.  The latter case dealt with packaging, not the product itself.  When the trade dress, the mere packaging of a product, copies the packaging of another product, the Carol Cable rationale holds.  The instant case, on the other hand, deals with a trademark of a design.  The piece of furniture is both the trademark and the product.  Accordingly, a manufacturer might copy not because there is secondary meaning to capitalize upon, but because consumers desire that particular style in a furniture product.

This leaves the court with much speculation and little evidence concerning the relevant associations of actual customers. Alphaville has made a tepid showing at best that consumers do not associate the pieces in the Barcelona collection with a single source.

Moreover, the degree and manner of Knoll's use of the designs supports a denial of summary judgment. Alphaville does not dispute the fact that Knoll has sold the pieces in the Barcelona collection continuously for decades. Knoll has presented several pieces of advertising suggesting that, at various times, it has made some attempt to exploit the Barcelona Chair in particular in the manner of a trademark. It is debatable whether Knoll has actually used any of the pieces as trademarks to a substantial extent, but this is an issue for trial.

Alphaville's evidence focuses on the question of whether Knoll's use of the design trademarks has been exclusive. Alphaville has pointed to the 1968, 1990 and 1991 letters to suggest that Knoll knew about reproductions and did nothing to police the purported infringement. Alphaville has also shown that many companies continue today to sell furniture based on the designs, both online and through brick-and-mortar outlets. At first blush, these pieces of evidence provide a strong basis to infer that Knoll's use of the trademarks has been non-exclusive. Yet Alphaville has provided no evidence shedding light on the relative market dominance of Knoll versus the sellers of reproduction Mies furniture. The determination of secondary meaning would be helped greatly by some comparison of Knoll's sales and those of other sellers. If, for instance, Knoll sold but a tiny fraction of all furniture based on the Mies design, an inference of no secondary meaning would be supported; if Knoll sold an overwhelming proportion of them, the converse would be true. Here is another important hole in the evidence provided by Alphaville.

Alphaville may well have put together enough evidence to convince a jury that the pieces in the Barcelona collection lack secondary meaning. Yet Knoll has raised genuine issues of material fact, and Alphaville, therefore, cannot prevail as a matter of law.

II.    Allegations of Fraud on the USPTO

10

United States District Court

For the Northern District of California

1    Alphaville seeks to cancel Knoll's trademarks on the Barcelona collection designs on the

2    basis of Knoll's purported fraud on the USPTO.  Specifically, Alphaville contends that Knoll,

3    through statements made by its Vice President, Carl G. Magnusson, made false representations by

4    (1) stating that Knoll made substantially exclusive use of the proposed designs, and (2) failing to

5    disclose the existence of allegedly material utility patents.[3]  To prevail on a theory of fraud,

6    Alphaville must meet the "heavy burden" of proving that (1) Knoll made a false representation

7    regarding a material fact, (2) Knoll knew or believed that the representation was false, (3) Knoll

8    intended that the USPTO rely on the misrepresentation, (4) the USPTO reasonably relied on the

9    misrepresentation, and (5) Alphaville suffered damages as a result of this reliance.  Robi v. Five

10   Platters, 918 F.2d 1439, 1444 (9th Cir. 1990).

11   First of all, Alphaville contends that Magnusson fraudulently declared that Knoll made

12   substantially exclusive use of the proposed designs.  When Knoll filed its respective trademark

13   applications for the five designs, it submitted supporting declarations from Magnusson for each.  In

14   these declarations, Magnusson stated that the designs had become distinctive by reason of Knoll's

15   substantially exclusive use in commerce.  Magnusson did not disclose to the USPTO that third

16   parties were producing and selling furniture based on these designs.  According to Alphaville,

17   Magnusson's failure to disclose the use of the designs by third parties was a knowing falsehood.

18   In trademark law, "substantially exclusive" use does not require absolutely exclusive use on

19   the part of the applicant.  See L.D. Kichler Co. v. Davoil, Inc., 192 F.3d 1349, 1352 (Fed. Cir. 1999).

20   As a result, the mere use of a mark by a third party may not be sufficient to defeat a claim of

21   substantially exclusive use.  See id.  Furthermore, the trademark applicant need only disclose to the

22   USPTO those users it *knows* to have superior or clearly established rights in the proposed mark.  See

23   Hana Fin., Inc. v. Hana Bank, 500 F. Supp. 2d 1228, 1235 (C.D. Cal. 2007).  "The statement of an

24   applicant that no other person 'to the best of his knowledge' has the right to use the mark does not

25   require the applicant to disclose those persons whom he may have heard are using the mark *if he*

26   *feels that the rights of such others are not superior to his*."  Quiksilver, Inc. v. Kymsta Corp., 466

27

28

United States District Court

For the Northern District of California

1    F.3d 749, 755 (9th Cir. 2006), quoting Yocum v. Covington, 216 U.S.P.Q. 210, 216-17 (T.T.A.B.

2    1982) (emphasis in original).

3         Alphaville relies upon the 1968 letter stating that the designs were in the public domain and

4    the 1990 and 1991 letters explicitly or implicitly acknowledging the existence of numerous

5    unauthorized reproductions.  According to Alphaville, these demonstrate that Knoll knew others had

6    superior or clearly established rights to use the designs.  Knoll, on the other hand, contends that

7    Magnusson believed his statements to be true when he signed his declarations and continues to

8    believe these statements to be true today: although some companies had been infringing upon the

9    marks represented by the Mies designs, their right to use the marks was inferior.

10        Even assuming that the 1968 letter is admissible,[4] Alphaville's evidence is inadequate to

11   show as a matter of law that Knoll, through Magnusson, made a false representation of material fact.

12   That third parties were producing and selling furniture based on Knoll's designs does not in itself

13   establish that Knoll's use of the designs was not substantially exclusive, see L.D. Kichler, 192 F.3d

14   at 1352, much less that Magnusson lied about the issue.  A single unsigned letter from 1968 likewise

15   does not establish as a matter of law that the designs were in the public domain or that Knoll

16   officials in 2003 thought they were in the public domain.  Accordingly, Alphaville's argument fails.

17        Alphaville alternatively contends that Knoll committed fraud on the USPTO by not

18   disclosing the existence of allegedly material utility patents in its trademark applications.  When

19   Knoll filed its trademark applications for the five Barcelona collection designs, the supporting

20   declarations from Magnusson stated that the designs were not subject to patent protection.[5]

21   Alphaville contends that these statements were false representations regarding a material fact

22   because several expired U.S. and foreign patents existed that would have been material to the

23   USPTO's decision to issue registrations for the designs.

24        Although there can be trademark and trade dress protection for designs and product shapes

25   such as furniture designs, protection is not available for product features that are "functional."

26   Qualitex Co. v. Jacobson Prods. Co., 514 U.S. 159, 165 (1995).  A utility patent provides "strong

27   evidence that the features therein claimed are functional."  TrafFix Devices, Inc. v. Marketing

28

                                                   12

**United States District Court**
For the Northern District of California

Displays, Inc., 532 U.S. 23, 29 (2001). When there is a utility patent that claims or references a feature that is shared by a proposed trademark, the USPTO is instructed to review the entire patent, and may even review the prosecution history of that patent, in order to determine whether the proposed trademark is functional and therefore ineligible for protection; courts do likewise. See TrafFix at 31 (analyzing specification and prosecution history); Trademark Manual of Examining Procedure § 1202.02. However, the mere existence of an undisclosed patent may not necessarily be a material fact for the purposes of trademark law, for "[i]t is probably the law that in the trademark context, a material misrepresentation arises only if the registration should not have issued if the truth were known to the examiner." San Juan Prods., Inc. v. San Juan Pools of Kansas, Inc., 849 F.2d 468, 473 (10th Cir. 1988), citing 2 J. Thomas McCarthy, § 31:21, at 606.

The three patents at issue are the 1929 German patent, the 1931 Spanish patent, and the 1942 U.S. patent. The U.S. patent teaches articles of furniture comprising chair supports that strongly resemble the chair supports of the Knoll Flat Brno chair. The patent specification further discloses the utility of using particular materials, such as steel tubing, for the chair supports in order to provide the requisite elasticity and strength. Similarly, the Knoll Flat Brno chair trademark application discloses metal chair supports. The German patent teaches a chair made of crosswise linked metal rails, and its specification also describes and depicts a stool made of similar crosswise linked metal rails. The specification further discusses the utility of connecting the metal rails in a particular configuration. The Knoll Barcelona Chair and Knoll Barcelona Stool strongly resemble the chair and stool depicted in the German patent and appear to adopt a similar configuration of crosswise linked metal rails. The Spanish patent is directed to springs that can be incorporated into chairs, armchairs and benches to increase the elasticity and comfort of the furniture. The Knoll designs do not visibly incorporate these features. Compare Green Dec., Exh. 2 (drawings in Spanish patent) with Green Dec., Exhs. 19 (Barcelona Chair trademark), 23 (Brno Chair trademark).

Although the items claimed and described in the U.S. and German patents strongly resemble Knoll's Flat Brno, Barcelona Chair and Barcelona stool designs, Alphaville must do more than show similarity. The question is whether the trademark should not have issued if the patents had been

disclosed to the examiner.  While a utility patent "is strong evidence that the features therein claimed are functional," TrafFix, 532 U.S. at 29, it is not dispositive.  It is possible that a piece of furniture may incorporate functional elements but still be worthy of trademark protection, because the standard is not whether some features of the proposed trademark are functional, but whether the design *as a whole* is functional.  See Kendall-Jackson Winery v. E. & J. Gallo Winery, 150 F.3d 1042, 1050 (9th Cir. 1998).  The issue of whether Knoll's Flat Brno, Barcelona Chair and Barcelona stool designs are functional as a whole, or merely incorporate functional elements, is a question of fact.  See Rachel v. Banana Republic, Inc., 831 F.2d 1503, 1506 (9th Cir. 1987).

At this stage in the proceedings, Alphaville has not presented sufficient evidence to show that there is no genuine issue of material fact as to the non-functionality of the Knoll designs as a whole.  In fact, Alphaville acknowledges in its reply that it is not asserting that the patents conclusively establish that the designs are functional.  See Alphaville's Reply at 14 n.2. Accordingly, the court cannot conclude that the examiner would have necessarily denied Knoll's trademark applications as non-functional had the patents been disclosed.  Alphaville has not met the high standard for materiality that is required by trademark law, and its motion to invalidate the trademark registrations for fraud on the USPTO based on Knoll's failure to disclose the existence of patents fails.

III.    Laches

Alphaville contends that Knoll should be barred from bringing suit by the doctrine of laches, because Knoll knew of Alphaville's sales of furniture based on the Mies designs on August 19, 2003, but did not file suit against Alphaville until November 7, 2007, more than four years later.[6] "Laches is an equitable time limitation on a party's right to bring suit, . . . resting on the maxim that 'one who seeks the help of a court of equity must not sleep on his rights.'" Jarrow Formulas, Inc. v. Nutrition Now, Inc., 304 F.3d 829, 835 (9th Cir. 2002).  A party asserting laches must show that "(1) [the] delay in filing suit was unreasonable, and (2) [that party] would suffer prejudice caused by the delay if the suit were to continue."  Id. at 838.  Where a federal statute like the Lanham Act does not

14

United States District Court

For the Northern District of California

1  contain an explicit statute of limitations, the Ninth Circuit presumes that Congress intended to

2  "'borrow' the limitations period from the most closely analogous action under state law." Id. at 836;

3  see also Saul Zaentz Co. v. Wozniak Travel, Inc., 2008 WL 2949423, at *14 (N.D. Cal. 2008)

4  (Patel, J.). Alphaville asserts that the statute of limitations of the most closely analogous state law is

5  four years.

6          One problem with Alphaville's laches argument stands out. Alphaville relies entirely upon

7  the August 19, 2003, Yahoo! printout to support its theory that Knoll knew of Alphaville's activities

8  at that time. Yet there has been no identification of the individual who printed the web page and

9  wrote on it. "A corporation is not charged with notice [of trademark infringement] if business

10 dealings with defendant were conducted by lower echelon employees who had no duty to report

11 instances of trademark infringement." McCarthy on Trademarks § 31:39, citing General Tire &

12 Rubber Co. v. Greenwold, 127 U.S.P.Q. 240 (S.D. Cal. 1960). For a corporation to be so charged,

13 an employee must have duties with respect to trademark matters. See Official Airline Guides v.

14 Churchfield Pub's, 756 F. Supp. 1393 (D. Or. 1990). While the annotation "#2 on yahoo" suggests

15 that an employee who saw the website was interested in Alphaville's activities, the court can only

16 speculate as to whether the employee or employees who saw the web page had duties with respect to

17 trademark matters. Moreover, both Magnusson and Elizabeth Needle, two former or current top

18 executives at Knoll, denied knowledge of the printout or Alphaville's activities before 2007. See

19 Misthal Dec. ¶¶ 96-97 (and accompanying exhibits); Needle Dec. ¶¶ 98-99.

20        In short, Knoll has raised issues of material fact as to the date at which it became aware of

21 Alphaville's alleged infringement. It is therefore impossible to say that the delay in filing suit was

22 unreasonable. Alphaville cannot prevail on its laches defense on summary judgment.

23

24 IV.     The "Barcelona" Mark

25        In addition to its challenge of the design trademarks, Alphaville asks for judgment that it

26 does not infringe the "Barcelona" mark, on three unrelated grounds: laches, mootness and invalidity.

27 The laches argument has been discussed and, for the purposes of this motion, rejected. Providing no

28

legal analysis, Alphaville argues that Knoll's counterclaims are moot, as Alphaville no longer uses the "Barcelona" mark in its marketing materials.  Alphaville has itself admitted that it made "occasional and inadvertent trademark use of the 'Barcelona' term early in the life of the company."  Mot. at 19-20.  It would be premature to dismiss Knoll's counterclaims for past damages on this basis.  Since Alphaville has provided no authority to suggest when injunctive relief should become moot, it is likewise inappropriate to rule out injunctive relief at this time.

Finally, Alphaville contends that the Barcelona mark is generic.  This is another way of asking whether or not the mark has secondary meaning.  Alphaville cites the existence of a dictionary entry for "Barcelona Chair" as evidence that the term is generic.  See Smith Dec. ¶ 31 & Exh. 8.  Knoll responds by entering into evidence four dictionary entries that either identify the Barcelona Chair as a trademark or Knoll as the manufacturer.  See Misthal Dec. ¶¶ 99-101, Needle Dec. ¶ 49.  Whatever the significance of a dictionary's designation of a word as a "trademark," if any, the battle of the dictionaries yields no clear answer.

The evidence weighs even more strongly in favor of finding secondary meaning for the Barcelona mark than for the designs.  Knoll's policing of the mark has been more rigorous, as Alphaville admits.  Many manufacturers of unauthorized reproductions intentionally avoid using the name "Barcelona," see Lee Dec. ¶ 9, suggesting a recognition that "Barcelona Chair" signifies something more than just the style of chair.  Finally, the existence of "Barcelona Chair" in the dictionary does not, standing alone, prove that "Barcelona" has become generic.[7]

Alphaville has not met the standard for finding as a matter of law that it does not infringe the Barcelona mark.

V.      Alphaville's Affirmative Defenses Relating to the 1965 Agreement

Knoll has also filed a motion for partial summary judgment, seeking declarations that Mies assigned all worldwide right and title to the Barcelona collection designs to Knoll's predecessor per the 1965 agreement, and that through a good chain of title, Knoll owns all rights and interests in the designs.  Knoll also seeks summary judgment that it accurately represented its ownership of the

16

United States District Court

For the Northern District of California

1   Barcelona collection to the USPTO during the trademark registration process.  Finally, Knoll moves

2   to strike or dismiss Alphaville's sixth, seventh and tenth affirmative defenses to the extent that thy

3   allege Knoll committed fraud on the USPTO by declaring that Mies assigned all rights, title and

4   interest to Knoll's predecessor via the 1965 agreement.

5         Some portions of Alphaville's affirmative defenses should clearly be dismissed.  Paragraph

6   20 of Alphaville's Sixth Affirmative Defense alleges that Knoll does not have any license agreement

7   with Mies that grants Knoll the rights it alleges.  The 1965 agreement has now been produced, and

8   Alphaville admits that the agreement purported to assign all of Mies's rights to Knoll's predecessor.

9   See Opp. at 8.[8]  The motion to strike Paragraph 20 of the Sixth Affirmative Defense is GRANTED.

10  Similarly, to the extent that Paragraph 25 of the Seventh Affirmative Defense alleges that there was

11  no agreement or that the agreement, on its face, only licensed Mies's name and signature, the motion

12  to dismiss GRANTED.  Finally, Paragraph 41, sub-paragraph (a), of the Tenth Affirmative Defense

13  alleges that the 1965 agreement did not cover the right to use Mies's designs.  As this contradicts the

14  plain language of the 1965 agreement, the motion to dismiss is GRANTED as to this sub-paragraph.

15  The motion to strike any other portions of the affirmative defenses is DENIED.

16        As for the rest of the motion, there is an odd disparity between the issues argued by Knoll

17  and the relief requested.  Knoll first argues that two courts have decided that Knoll owns worldwide

18  rights and title to the Barcelona collection, and that this court should find this to be so as a matter of

19  issue preclusion.  Knoll then engages in an alterative argument attempting to show that the 1965

20  agreement was an assignment, not merely an exclusive license, and that Knoll has a good chain of

21  title.  Knoll would apparently like to bootstrap these arguments into determinations that Knoll

22  actually owned all rights, title and interest in the designs in 2003.  Knoll ignores the fact that a valid

23  assignment and good chain of title do not necessarily result in the conclusion that Knoll had

24  trademark rights in 2003 or has them currently.  Specifically, the trademark rights will not be valid if

25  the designs have gone into the public domain at any time, either before or after 1965.  Neither the

26  earlier cases nor Knoll's arguments bear upon this issue.

27

28

United States District Court

For the Northern District of California

1    Knoll argues that two separate cases have previously found that the 1965 agreement granted

2    Knoll full worldwide right, title and interest to the designs.  One case cited is a 2006 case in the U.S.

3    Court of Appeals for the Second Circuit.  Leather Form S.R.L. v. Knoll, Inc., 205 Fed. Appx. 861

4    (2d Cir. 2006).  That opinion merely affirmed the district court's decision not to exercise jurisdiction

5    based on the fact that a German court was already considering the issues and the suit represented an

6    attempt to circumvent said German court.  The Second Circuit commented in a footnote, in dicta, on

7    the likely merits of that case.  Even then, the court merely opined that the 1965 agreement was clear

8    on its face that the assignment was without geographic limits.  Id. at 864 n.1.  Even if this footnote

9    were not dicta, it does not by any stretch of the imagination find that Knoll actually has exclusive

10   worldwide rights to the designs.  Knoll's argument is disingenuous.

11   The second case upon which Knoll relies is the German case of Knoll International Spa. v.

12   La Nuova Casa Moebelhandels GmbH & Co. KG, No. 308 O 462/03 (Landgericht (District Court)

13   Hamburg 2005).  In that case, a Knoll affiliate asserted rights to the Barcelona Chair and Stool, the

14   Brno Chair and a design not at issue in this case, under German copyright law.  The German court

15   found that the 1965 agreement did assign all of Mies's rights to Knoll's predecessor, and the court

16   ordered damages and issued an injunction.  Alphaville does not dispute that a German ruling can

17   have res judicata[9] effect in a U.S. federal court.  Instead, Alphaville contends that issue preclusion

18   cannot apply because Alphaville was not in privity with either defendant in the German case.

19   To invoke non-mutual offensive preclusion, a party must show, among other things, that the

20   adversary was a party or was in privity with a party to the prior action.  Resolution Trust Corp. v.

21   Keating, 186 F.3d 1110, 1114 (9th Cir. 1999).  The U.S. Supreme Court recently rejected the theory

22   of "virtual representation" upon which Knoll relies.  Taylor v. Sturgell, ___ U.S. ___, ___, 128 S.Ct.

23   2161, 2178 (2008).  In Taylor, the Court also elaborated a test for non-party preclusion.  See id. at

24   2178-2179.  It does not appear that this situation meets any of the six factors enumerated by the

25   Court.  There is no indication that Alphaville: agreed to be bound by the German suit; had a legal

26   relationship with the German defendants; exercised control over the German suit; was adequately

27   represented in the German suit; or is bringing suit as a representative or agent of a party who is

28

18

United States District Court

For the Northern District of California

1    bound by the prior adjudication.  Finally, there is no special statutory scheme limiting relitigation.

2    Under Taylor, Alphaville is not in privity with the German defendants.  It is also worth noting that

3    Alphaville could probably not be in privity with the German defendants if they are competitors in

4    business.  Metro Indus. v. Sammi Corp., 82 F.3d 839, 848 (9th Cir. 1996) ("[T]hough they shared

5    the same attorney, Metro and Vollrath, as competitors, were not in privity."), citing Shaw v. Hahn,

6    56 F.3d 1128, 1131 (9th Cir. 1995).[10]

7        The Second Circuit case has no preclusive effect, and Alphaville was not in privity with any

8    party to the German case.  Accordingly, there is no issue preclusion.

9        Aside from the issue preclusion argument, Knoll makes a cogent case for the fact that the

10   1965 agreement assigned all of Mies's rights (whatever they were) to Knoll's predecessor and that

11   Knoll has a good chain of title to these purported rights.  Alphaville does not contest these two

12   points, so they are considered to have been conceded.  While Knoll has raised a genuine issue of fact

13   to rebut Alphaville's motion of invalidity, see above, Knoll has not proven as a matter of law that the

14   Mies designs are not in the public domain.  Indeed, the extensive sales of furniture based on the

15   Mies designs by companies not authorized by Knoll to do so suggests otherwise.  In the same vein,

16   although summary judgment cannot be granted to Alphaville on the question of fraud on the

17   USPTO, Knoll fails to show as a matter of law that it did not commit fraud on the USPTO.

18   Materiality and intent are questions of fact.  While suitable for a jury determination, they are not

19   suitable for summary judgment on this record.  Accordingly, except as described above, Knoll's

20   cross-motion for partial summary judgment is DENIED.

21

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28

19

CONCLUSION

For the reasons stated above, Alphaville's motion for partial summary judgment is DENIED. Knoll's motion for partial summary judgment is GRANTED in part and DENIED in part, as described above.

IT IS SO ORDERED.

Dated:   June 5, 2009

_____
MARILYN HALL PATEL
United States District Court Judge
Northern District of California

United States District Court

For the Northern District of California

20

**United States District Court**
For the Northern District of California

1

2                                                      **ENDNOTES**

3    1.      <u>Vision Sports</u> dealt with allegations of trade dress, rather than trademark, infringement.  For the
     purposes of this discussion, there is no legally relevant difference between the two concepts.

4

5    2.      The U.S. Court of Appeals for the Sixth Circuit has set out a seven-factor test for analyzing
     secondary meaning.  <u>See</u> <u>Herman Miller, Inc. v. Palazzetti Imports and Exports, Inc.</u>, 270 F.3d 298, 311-
     312 (6th Cir. 2001), <u>citing</u> <u>Marketing Displays, Inc. v. TrafFix Devices, Inc.</u>, 200 F.3d 929, 937 (6th Cir.

6    1999), <u>rev'd on other grounds sub nom.</u> <u>TrafFix Devices v. Marketing Displays, Inc.</u>, 532 U.S. 23
     (2001).  This test has not been adopted in the Ninth Circuit.

7           The <u>Herman Miller</u> plaintiff accused the defendant of trade dress and trademark violations for
     selling unauthorized reproductions of its Lounge Chair and Ottoman.  The court engaged in a detailed

8    analysis of secondary meaning under the Sixth Circuit test.  Although <u>Herman Miller</u> is not controlling,
     the factual similarities to the instant case are great.  Inexplicably, neither party discussed or cited

9    <u>Herman Miller</u>.

10   3.      Alphaville also asserts that the Riley declaration was part of the deception in that it included
     excerpts from a book but did not include other excerpts from the same book showing the Mies patents.

11   The following analysis relating to Magnusson's alleged false statements pertains equally to the Riley
     declaration.

12

13   4.      The letter is unsigned and it is therefore unclear whether qualifies as an admission of a party-
     opponent.  <u>See</u> Fed. R. Evid. 801(d)(2).  To be admissible as a record of regularly conducted activity,
     the testimony of the custodian of that record or other qualified witness must be offered unless the record

14   is certified in accordance with Federal Rule of Evidence 902(11).  <u>See</u> Fed. R. Evid. 803(6).

15   5.      The court notes that Magnusson's averment was phrased in the present tense.  Knoll does not
     dispute Alphaville's assumption that the phrase "is not subject to any patent protection or application"

16   covers expired patents.

17   6.      This set of cross-motions was supposed to deal with invalidity/validity of the trademarks.  <u>See</u>
     Docket No. 55 (minute order).  Strictly speaking, laches is a defense to infringement, rather than a way

18   to prove trademark invalidity.  The issue being briefed and ripe for judgment, however, there is no
     reason not to address it.

19

20   7.      Alphaville has not argued that the "Barcelona" mark is weakened by the fact that is a
     geographical term.

21   8.      In its reply, Knoll mischaracterizes Alphaville's statements about the 1965 letter.  <u>See</u> Reply at
     5:28-6:4.  Alphaville's argument was that, while Mies stated he was assigning the rights he had, he did

22   not have exclusive rights to assign.  Knoll mischaracterizes this statement in an attempt to assert that
     Alphaville recognized Mies had rights to assign.

23          The court reminds counsel for both parties that they owe a duty of candor to the court.  Twisting
     facts, the holdings of cases or the statements of one's adversary in a way intended to deceive the court

24   is not good advocacy.

25   9.      The High Court has taken a long-awaited stand concerning the terminology used to discuss
     preclusion.  Writing for the court, Justice Ginsburg stated that "The preclusive effect of a judgment is

26   defined by claim preclusion and issue preclusion, which are collectively referred to as 'res judicata.'"
     <u>Taylor v. Sturgell</u>, 128 S.Ct. 2161, 2171 (2008).  The Court unambiguously rejected the use of the terms

27   "merger," "bar," "collateral estoppel," and "direct estoppel."  <u>Id.</u> n.5.

28

                                                         21

10.  The court finds no support for Knoll's assertion that <u>Metro Industries</u> is limited to the anti-trust context.