```
                                                  Pages 1 - 20

              UNITED STATES DISTRICT COURT

            NORTHERN DISTRICT OF CALIFORNIA

         BEFORE THE HONORABLE MARILYN HALL PATEL

ALPHAVILLE DESIGN, INC., a      )
Delaware corporation,           )
                                )
          Plaintiff,            )
                                )
  VS.                           ) No. C 07-5569 MHP
                                )
KNOLL, INC., a Delaware         )
corporation,                    )
                                ) San Francisco, California
          Defendant.            ) Monday
_____) August 31, 2009
```

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**        LAW OFFICES OF GREEN & GREEN
                          1000 4th Street, Suite 595
                          San Rafael, California  94901
                     **BY: PHILIP GREEN, ESQUIRE**

                          COBLENTZ, PATCH, DUFFY & BASS
                          One Ferry Building, Suite 200
                          San Francisco, California  94111-4213
                     **BY: JEFFREY G. KNOWLES, ESQUIRE**
                          **JULIA D. GREER, ESQUIRE**

**For Defendant:**        MINTZ LEVIN COHN FERRIS GLOVSKY
                          5 Palo Alto Square, 6th Floor
                          Palo Alto, California  94306
                     **BY: KARINEH KHACHATOURIAN, ESQUIRE**
                          **ROBERT P. TAYLOR, ESQUIRE**

**Reported By:**   *Katherine Powell Sullivan, CSR #5812*
                   *Official Reporter - U.S. District Court*

```
 1                    P R O C E E D I N G S
 2   AUGUST 31, 2009                                    3:22 P.M.
 3
 4         THE CLERK:  Calling civil 07-5569, Alphaville Design,
 5   Inc. versus Knoll, Inc.
 6         MS. KHACHATOURIAN:  Good afternoon, Judge Patel.
 7         THE COURT:  Good afternoon.
 8         May I have your appearances, please.
 9         MS. KHACHATOURIAN:  Yes.  Karineh Khachatourian and
10   Bob Taylor from Mintz Levin, for Knoll, Inc.
11         THE COURT:  Yes.
12         MR. GREEN:  Philip Green, Jeff Knowles and Julia
13   Greer for Alphaville.
14         MR. KNOWLES:  Good afternoon.  Jeffrey Knowles
15   appearing for Alphaville.
16         THE COURT:  Good afternoon.
17         I did not get anything in terms of the case
18   management conference statement from you all.  The last you
19   were here on the calendar, I think other counsel withdrew.  And
20   then I did get notice that you were appearing in this matter.
21         MR. KNOWLES:  That's right, Your Honor.
22         THE COURT:  Mr. Knowles and Ms. Greer.
23         So that's where we are.  But nothing else has been
24   filed.  I don't even know if we have dates in this case, any
25   future dates or not.
```

1          **MS. KHACHATOURIAN:** Your Honor, there are a few
2 things I would like to bring to the Court's attention first.
3 We have a mediation scheduled per the Court's order.
4          **THE COURT:** Music to my ears.
5          **MS. KHACHATOURIAN:** October 28th, with Judge Infante.
6 In connection with that mediation, there have been several
7 developments that occurred after the case management conference
8 that causes Knoll some concern.
9          The first is on July the 28th, Phil Green issued a
10 press release on behalf of Alphaville, stating that the judge
11 had cleared the way for this case to go to trial, and made
12 certain statements in the press release that Knoll takes issue
13 with.
14          Arising from that press release was an article in
15 what's called the *Monday Morning Quarterback*, which is one of
16 the largest trade publications in this industry.
17          In that article, Mr. Green is quoted as stating that
18 Carl Magnusson, who is the former vice president of design at
19 Knoll, committed fraud on the PTO when he submitted his
20 declaration to the PTO. Obviously, Knoll thinks that these
21 allegations are unfounded.
22          Nonetheless, in that article Mr. Green also states
23 that everyone in the industry who is not a Knoll retailer
24 should support Alphaville in this fight. And I have the
25 article and the press release, if the Court wants to see it.

```
 1              The problem here is that events such as these
 2    diminish Knoll's ability at mediation to make compromises,
 3    particularly when we have not had a trial date, there are no
 4    dates set, and the case has been pending for two years, and
 5    Alphaville still continues to be able to sell the product
 6    without much consequence, particularly when a jury pool, a jury
 7    has not even been selected yet.
 8              So to restore Knoll's faith in the process, we're
 9    respectfully requesting two things:  One, that a trial date be
10    set immediately; and, two, that some instructions from the
11    Court be given so that statements such as this about Knoll's
12    key witness not be made in the press.
13              **THE COURT:**  Well, first of all, I am concerned about
14    what you've just raised.  I dare say that the jury pool
15    probably would not have very many, if any, readers of -- what
16    is it called, *Monday Morning Quarterback*?
17              **MS. KHACHATOURIAN:**  Yes.
18              But they have the Internet, and it's Internet
19    accessible.  And we know all know that jurors like to do
20    alternative research, whether they are supposed to or not.
21              **THE COURT:**  Well, they are not supposed to.  And if
22    they do, that's a problem.
23              **MS. KHACHATOURIAN:**  I also received a call from the
24    *Recorder* about the press release.
25              **THE COURT:**  They don't have enough, I guess, to
```

```
 1  report on so they have to find things.
 2            MS. KHACHATOURIAN:  And the problem I find myself in,
 3  as you can imagine, is I have a client that's extremely angry
 4  about this months before a mediation, and feels like they have
 5  no recourse and have diminished their ability to compromise --
 6            THE COURT:  And your client hasn't issued any press
 7  release at all?
 8            MS. KHACHATOURIAN:  No.  In fact, Your Honor, our
 9  client has declined to comment even though asked.
10            THE COURT:  Well, that kind of thing really -- that
11  is not appropriate.
12            MR. GREEN:  Well, Your Honor, I need to address these
13  things.  One is I have been seriously misquoted in the press.
14  It's happened before.
15            THE COURT:  Well, then don't speak to them.
16            MR. GREEN:  You're right.  And I am not going to from
17  here on out.
18            THE COURT:  That's how you solve that problem.
19            I know.  They come into court and report things, and
20  we didn't say any such thing.  But we have a transcript.
21            But the clue there is don't talk to the press.  And
22  so I'm going to order that there not be any discussion by any
23  party to this litigation with members of the press regarding
24  this case.
25            MR. GREEN:  Well, we could narrow that, perhaps, to
```

```
 1  the attorneys in the case.
 2          THE COURT:  Well, about this case.  I think,
 3  otherwise, we have people running out there from the companies
 4  making all kinds of statements, and so on and so forth.
 5          They would be well-advised not to discuss the matter
 6  of the case with the press.  That doesn't prohibit them from
 7  talking to the press if they have a new product or a new line,
 8  or something like that.  Or something new about their business
 9  or whatever.
10          Just nothing about the case.  Period.  That's the
11  safest thing.
12          MR. KNOWLES:  Understood, Your Honor.
13          I'm not quite sure why we're talking about this.  It
14  seems to me we should be talking about how to get the case
15  resolved.
16          THE COURT:  I agree with that, also.  And also set a
17  trial date.
18          But I think one of the problems was there was a
19  motion that involved an extraordinary amount of paper.  I think
20  unnecessarily too much paper.  It was not justified in this
21  last go-around of motions.  And so that consumed a tremendous
22  amount of time.
23          And then I think at the next hearing, or shortly
24  thereafter, when I think we probably were going to set dates,
25  then counsel withdrew.
```

1                And are you prepared to set dates for trial?

2                **MR. KNOWLES:** I am, Your Honor. I have no objection
3    to setting a trial date. Obviously, I want to talk about when
4    this date should be. And I think we may need to discuss a few
5    things in advance of when we actually set the date, so that we
6    can make a realistic estimate of how long it's going to take to
7    be ready for trial. I am happy to discuss those now.

8                **THE COURT:** We need to figure out -- and that's why
9    we should file something. So proposing some dates, that would
10   have helped if that had been done.

11               **MR. GREEN:** Actually, Your Honor, I recall from the
12   last conference, you asked the parties not to file any papers
13   in advance of this one.

14               **MS. KHACHATOURIAN:** The last one --

15               **THE COURT:** That's because you had besieged me with
16   so many.

17               **MS. KHACHATOURIAN:** Right.

18               **THE COURT:** I guess I wanted to see new counsel in
19   here, and if there was going to be new counsel, and what was
20   going to happen.

21               It was not a wise idea, at that point, to set a trial
22   date, since because if there was going to be additional counsel
23   we may have to undo that which we just did.

24               That made some sense. But not filing any papers,
25   that was probably an overreaction to the volume of paper that I

1  had just had to deal with.  It was stacked up on chairs, on the
2  floor, everywhere else.  In my office and the clerk's office.
3  Right?  We know about the amount of paper involved.  And so
4  we're not going to go through that again.
5          But, in any event, I think the first question is:
6  How much time to complete whatever discovery remains to be
7  done?  And then are there any other motions, other than what
8  would be motions in limine?
9          **MR. KNOWLES:**  May I address that, Your Honor?
10         **THE COURT:**  Yes.
11         **MR. KNOWLES:**  To get straight to the point, I think
12 we can complete discovery in the next four to five months.
13         What we -- we made some progress in the last few
14 weeks since the last case management conference.  We've also
15 hit some significant snags in discovery.
16         We do anticipate that there may be some discovery
17 motion practice.  And from what's happened so far, I can see
18 that you're enthusiastic about that idea.
19         **THE COURT:**  We don't do it.
20         **MR. KNOWLES:**  Well, let's put it this way.  We think
21 there may need to be some judicial intervention on some issues.
22         There are a number of issues that are going to be
23 worked out.  Not major issues.  We are close to resolving them.
24         Now, I think there are some others, just a handful,
25 three, maybe four, where it may come to some need for your

assistance. And I'm happy to discuss those now. They are actually quite discreet and quite straightforward.

Having accomplished the discovery, we think we could have an expert discovery cutoff a couple of months after that. There could be some post discovery motion practice, dispositive motion practice.

As you may recall, one of the issues that arose with respect to the last round of briefing was that there was a key document, one that Knoll produced, indicating that Knoll was aware of Alphaville's sale of these products as early as August of 2003.

But the open issue with respect to that document was whether or not a particular -- whether a person at Knoll who had some trademark responsibilities had seen it within that time frame.

And we propounded interrogatories in accordance with the Court's instruction, to see if we could determine that. And the answer that came back, in some ways unsurprisingly, in lawyer-crafted responses was, Gee, we've asked everybody, and no one knows.

So we think we are going to have to take a series of depositions to nail down where this document originated and where it went shortly after it was originated. So that will take some time.

If we, in fact, do determine that the origin of this

```
 1  document was one in which someone at Knoll had knowledge and
 2  had trademark responsibilities of the sale of these products,
 3  then we might bring a renewed motion for summary judgment,
 4  since that would give us a very strong dispositive latches
 5  motion.  That's the one motion that we can foresee might grow
 6  out of this discovery.
 7           And so we would anticipate that we would want to set
 8  the dispositive motion deadline some distance after the close
 9  of all discovery.
10           And with all of that in mind, we think we can
11  probably be ready for trial in June or July of next year.
12           MS. KHACHATOURIAN:  Your Honor, we were thinking
13  February.  The reason for that is as follows:
14           For example, the document they're referring to was a
15  document that we produced at least a year ago.  Alphaville has
16  not acted reasonably in taking whatever discovery they think
17  they need to take.
18           In my view, the reason for that is, as I said, it's
19  in their interest to delay this case and avoid a trial date
20  because they get to sell the accused infringing products and
21  make a profit while this case goes on with absolutely no
22  consequence.
23           We responded to the interrogatories in good faith,
24  and we provided a lot more than what is being said to you.  We
25  specifically stated that the document was found in 2005,
```

```
 1  through a different lawsuit.
 2          And we've also produced 40 -- we've produced 4
 3  gigabytes of e-mails.  They've known about all of our witnesses
 4  for two years.  We've given them the settlement agreements
 5  they've asked for.  They have everything they could possibly
 6  need to go to trial.
 7          If there's any follow-up, it should be a month.  They
 8  don't need five to six months to conduct discovery for a case
 9  that has been pending since November 2007.
10          Not to mention the fact that the date of this Yahoo!
11  document is 2003.  We would still be within the four years that
12  the case law identifies as far as latches.  And, frankly, it's
13  not case dispositive.
14          So as far as we're concerned, it's a red herring.
15  And there is absolutely no reason why a trial date shouldn't be
16  set in February, given the length and how old this case is.
17          Not to mention, also, that without the pressure of a
18  trial date, Knoll firmly believes that Alphaville will have
19  absolutely no reason to compromise at mediation, because they
20  continue to profit from the sales of these products.
21          And Knoll's faith in the process has been diminished
22  because, from their point of view, they filed a lawsuit in
23  New York; it got transferred out here in the middle of
24  settlement negotiations --
25          THE COURT:  We don't need --
```

1          **MS. KHACHATOURIAN:**  You know the whole history.

2          **THE COURT:**  You don't need to go back to Genesis.

3          **MS. KHACHATOURIAN:**  So it's been pending for such a
4  long time, while the product still continues to be sold with,
5  as far as they're concerned, no consequences.

6          There's no better way to put pressure on two parties
7  to settle than to have a trial date coming up quickly.

8          **MR. KNOWLES:**  Your Honor, we are eager to get this
9  case resolved.  Knoll is busily interfering with our client
10 relationships, sending our clients notices, saying, "You are
11 selling illegal products.  Stop doing business with
12 Alphaville."  And that's happening.

13         It is not good for my client for this case to be
14 pending.  Having said that, I want to be realistic about how
15 long it's going to take to get to trial, because the fact is we
16 are not getting everything we need.

17         I know it's not terribly surprising that an
18 interrogatory, which was the way that we anticipated getting an
19 answer to this origins question, didn't supply a meaningful
20 answer.  But all indications are we are not going to get one
21 without taking a series of depositions.

22         There's another significant issue, and that is we are
23 having a problem with search terms.  We asked Knoll to search
24 certain terms.  They said those terms are going to be
25 problematic; they are going to return too many results; it's

```
 1  going to cost too much.
 2           We said, Let's do a test search on those terms.  If
 3  they return a lot of results, we'll figure out how to pare them
 4  down.
 5           They said, It will still cost too much.
 6           And we said, How much and why?
 7           And they said, We're not telling you.
 8           THE COURT:  And this is to search through what?  Are
 9  these e-mails?
10           MR. KNOWLES:  Most notably, e-mails.
11           THE COURT:  Are there some other kinds of invoices or
12  records, or whatever --
13           MR. KNOWLES:  Most notably e-mails, Your Honor.
14           MS. KHACHATOURIAN:  Your Honor, we have restored
15  backup tapes.  And we have searched 2001 to 2009, of seven
16  custodians, including the general counsel of Knoll, and Mark
17  Misthal, who is co-counsel, which is unheard of.
18           They provided a list of 38 search terms with terms
19  like "chair," "China," "patent," "Gordon," "German," "Germany."
20  You can imagine in a company like Knoll, from a span of 2001 to
21  2009, searching patent lawyer files where if you say the word
22  "patent" you are going to get every document reference having
23  to do with the U.S. PTO.
24           THE COURT:  Have you met and conferred?
25           MS. KHACHATOURIAN:  We have, Your Honor.
```

1              **THE COURT:**  Look, what I'm going to do is I'm going
2    to set a date for trial somewhere in April or May.  I can't get
3    it to trial in February because I have other cases set for
4    trial then.
5              And I think pushing it off to June or July is too
6    long.  This case has been pending for a while.  So you know
7    what to aim for.  I'm talking about April or May.
8              What I'm going to have you do is I want you to meet
9    and confer and pick a date with the help of Mr. Bowser, whom
10   you can contact for trial and for pretrial, which usually we do
11   a couple of weeks before.  In this case, I'm going to have a
12   little earlier than that.
13             And what I'm going to have you do then is pull
14   together some other information I'm going to ask you to
15   include, and I'm going to put it on the calendar for
16   September 14th, which is --
17             **MR. TAYLOR:**  Two weeks.
18             **THE COURT:**  Two weeks, isn't it?  Scary.  It can't
19   be.  Two weeks from now.
20             So you've got a week to get this stuff together and
21   get it in.  What I want is, essentially, a Rule 26(f) kind of
22   document, plus some other dates.  And I want you to spell out
23   the remaining discovery that you have to do, including
24   depositions, and the form of it.
25             So it's going to be depositions, interrogatories,

1  requests for production.  And I expect everybody to comply with
2  discovery requests on both sides.
3          And then just in brief statement form, without a lot
4  of argument or any much argument at all, just what the areas of
5  contention are with regard to discovery.  That's the only paper
6  I am going to allow you.
7          And then we'll take it up.  We'll put it on the
8  calendar some afternoon when we don't have a complete law and
9  motion calendar.
10         And then proposed dates for the completion of
11 discovery and including -- Tony, you will attach the
12 information we need to the minutes; so you can pull it up on
13 ECF -- including a date for exchange and the names of witnesses
14 you intend to call in your case-in-chief.
15         A date, then, for close of discovery, other than for
16 experts.  Which should be about a month -- maybe in this case a
17 little less than that -- after that exchange of names of
18 witnesses, so that anybody who's on that list that you didn't
19 know about before can be deposed and finished before the close
20 of discovery.
21         A date for exchange of information with respect to
22 experts, including, you know, their final reports.  And a date
23 for, then, the close of -- well, the date for exchange of that
24 information and final report, and then a date for close of
25 discovery of experts.

```
 1              I don't know if you need to do rebuttal experts or
 2   not.  You can talk about that and see if you need to.
 3              And then a date for dispositive -- final date for
 4   dispositive motions hearing.
 5              And then pretrial and trial.  Okay.
 6              MS. KHACHATOURIAN:  Thank you, Your Honor.  And just
 7   so --
 8              THE COURT:  How long do you think it's going to take
 9   to try this case?  Do you have some sense of that?
10              MR. KNOWLES:  Truth be told, I haven't thought about
11   it, Your Honor.  I'm not sure.
12              MS. KHACHATOURIAN:  I would say a week to ten days.
13              MR. KNOWLES:  I probably don't have a large
14   disagreement with that.
15              THE COURT:  So we'll figure that out.  But, in the
16   meantime, no talking with the press about this case at all.
17              Alphaville may have to talk with the press about
18   their business, or something like that.
19              Of course, that's true on both sides, not to.
20   Obviously, there are other things that -- business activities
21   and sales and merchandise, or whatever, that aren't implicated
22   in this lawsuit.  So that's fine.  But nothing about this
23   lawsuit at all.
24              And I expect you to cooperate in discovery, and sit
25   down with those search terms and combinations, and so on, and
```

1  so forth, so that it doesn't become too burdensome, as well.
2          **MR. GREEN:**  One solution on those search terms that
3  we had proposed was to get the -- their IT company together
4  with our IT company and see if we can work out why -- you know,
5  the formats and the costs, and why and why not, in a technical
6  way.
7          **THE COURT:**  Well, sit down and work with the two IT
8  people, work out, you know, what kinds of formats, what kind of
9  programs there are, because maybe something can be designed,
10 even, if just searching in the ordinary manner is going to
11 bring up too many results.
12         Maybe they can devise a program that will accomplish
13 that more easily, as well.
14         But I think the two IT people should meet and confer.
15         **MS. KHACHATOURIAN:**  Your Honor, the IT person is
16 employed at Knoll.  Basically, Knoll restored their backup
17 tapes, did all the searches, and sent them to us for review.
18 And we reviewed over 40 gigabytes of e-mails.
19         So what we were going to suggest, once we had a
20 chance to discuss this, was if they wanted to run test searches
21 on those things, we could outsource it to a vendor where they
22 would just have to pay the cost.
23         The problem in estimating the cost is searches
24 sometimes take all day, and they charge by the hour.
25         **THE COURT:**  I'm not going to sit here and monitor

1  that.
2       **MS. KHACHATOURIAN:**  Understood.  I just wanted to be
3  honest and say that IT people can't meet.
4       **THE COURT:**  You need to meet and confer.
5       **MR. KNOWLES:**  Certainly, Your Honor.  If the IT
6  people can meet and confer and we can get a sense of scale,
7  maybe we can work it out.
8       **THE COURT:**  Exactly.
9       **MS. KHACHATOURIAN:**  And there is one issue on our
10 side, Your Honor, above the E discovery, because we do have a
11 lot of issues with their production.
12      But one in particular that we would need for
13 mediation is they claim that they do not have any information
14 to show their profit, "they" being Alphaville, for the sale of
15 these furniture, and that a lot of the financial information is
16 now missing.
17      And I don't really know how we can meet and confer
18 and resolve that.  My understanding is that it existed.  And
19 now I'm being told it doesn't.
20      **MR. KNOWLES:**  Your Honor, this falls into one of the
21 categories that is not a problem.  I could be wrong.
22      But we have given them a spreadsheet with all the
23 sales data up through June 30 of this year.  Evidently, they
24 want more than that.  And we're happy to discuss what more they
25 want than that.

```
 1              Evidently, they want profit information.  We'll look
 2   and see what we can find out.  The flip side of that is, of
 3   course, we think we don't have up-to-date sales information or
 4   product-by-product information --
 5              THE COURT:  Meet and confer --
 6              MR. KNOWLES:  Absolutely, Your Honor.
 7              THE COURT:  -- and get that down.
 8              And now, with new counsel in, maybe that will smooth
 9   the way to accomplish that, okay.
10              MS. KHACHATOURIAN:  Thank you, Your Honor.
11              MR. KNOWLES:  Thank you, Your Honor.
12              THE COURT:  No one can afford to be hardnosed.
13   Otherwise, you are going to lose your nose.
14              MS. KHACHATOURIAN:  Thank you, Your Honor.
15              MR. KNOWLES:  Thank you.
16              THE COURT:  I will see you on the 14th.  So get it in
17   by the 10th, if you can get it in by the 10th, so I have a
18   chance to review it before the 14th, your joint statement with
19   all these proposed dates.
20              And, most importantly, meet and confer in person,
21   first of all in person, over these discovery issues.  And then
22   submit what you haven't been able to resolve, in just a brief
23   statement of what the problem is, without arguing back and
24   forth about it, okay.
25              MR. KNOWLES:  Thank you, Your Honor.
```

```
 1        MS. KHACHATOURIAN:  Thank you, Your Honor.
 2        MR. GREEN:  Thank you, Your Honor.
 3        MR. TAYLOR:  Thank you, Your Honor.
 4        THE COURT:  Thank you.
 5        (At 3:45 p.m. the proceedings were adjourned.)
 6                        -  -  -  -
 7
 8
 9                    CERTIFICATE OF REPORTER
10        I certify that the foregoing is a correct transcript
11   from the record of proceedings in the above-entitled matter.
12
13   DATE:   Wednesday, September 9, 2009
14
                       s/b Katherine Powell Sullivan
15   _____
16        Katherine Powell Sullivan, CSR #5812, RPR, CRR
                        U.S. Court Reporter
17
18
19
20
21
22
23
24
25
```